UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

AGUDATH ISRAEL OF AMERICA, AGUDATH ISRAEL OF
KEW GARDEN HILLS, AGUDATH ISRAEL OF MADISON,
AGUDATH ISRAEL OF BAYSWATER, RABBI YISROEL
REISMAN, RABBI MENACHEM FEIFER, STEVEN
SAPHIRSTEIN,

|                          |                    |
|--------------------------|--------------------|
| Plaintiffs,              | Civil Action No. 1:20-cv-04834 |
| vs.                      |                    |
| ANDREW M. CUOMO, Governor of the State of New York, in his official capacity, | |
| Defendant.               |                    |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ i

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS ............................................................................................... 5

I.      Defendant's Selective and Discriminatory Enforcement of COVID-19
Restrictions ..................................................................................................... 5

II.     Defendant's Executive Order No. 202.68 Infringes Upon Orthodox Worship
Services ........................................................................................................... 8

III.    Plaintiffs' Houses of Worship Protect from the Transmission of COVID-19 ................ 11

ARGUMENT ............................................................................................................... 12

I.      The Restrictions on Houses of Worship in the Executive Order Are
Unconstitutional ........................................................................................... 12

      A.     The Right to the Free Exercise of Religion Exists Even During COVID-19 ...... 12

      B.     Defendant's Restrictions on Worship Are Unconstitutional ............................... 14

II.     Plaintiffs Will Suffer Irreparable Harm in the Absence of Injunctive Relief ................. 20

III.    The Balance of the Hardships Tips in Plaintiffs' Favor ................................................. 21

IV.    Injunctive Relief Would Serve the Public Interest ........................................................ 21

CONCLUSION .............................................................................................................. 22

# TABLE OF AUTHORITIES

CASE                                                                                                    Page(s)

*Benihana, Inc. v. Benihana of Tokyo, LLC*,
    784 F.3d 887 (2d Cir. 2015)....................................................................................12

*Calvary Chapel Dayton Vall. v. Sisolak*,
    140 S. Ct. 2603 (2020)..........................................................................................19

*Cent. Rabbinical Congress of the U.S. & Can. v. NYC Dep't of Health & Mental
Hygiene*,
    763 F.3d 183 (2d Cir. 2014)............................................................................ *passim*

*Chestnut Hill NY, Inc. v. City of Kingston*,
    2017 U.S. Dist. LEXIS 226807 (N.D.N.Y. Feb. 22, 2017) ...................................12

*Church of Lukumi Babalu Aye v. City of Hialeah*,
    508 U.S. 520 (1993).......................................................................................... *passim*

*Elrod v. Burns*,
    427 U.S. 347 (1976)..........................................................................................20, 21

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
    559 F.3d 110 (2d Cir. 2009)....................................................................................12

*Holt v. Hobbs*,
    574 U.S. 352 (2015)..................................................................................14, 18, 19

*Jacobson v. Commonwealth of Mass.*,
    197 U.S. 11 (1905)..................................................................................................19

*Jolly v. Coughlin*,
    76 F.3d 468 (2d Cir. 1996)..................................................................................20, 21

*LeBlanc-Sternberg v. Fletcher*,
    67 F.3d 412 (2d Cir. 1995)..................................................................................20, 21

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*,
    138 S. Ct. 1719 (2018)........................................................................................13, 18

*N.Y. Progress & Prot. PAC v. Walsh*,
    733 F.3d 483 (2d Cir. 2013)....................................................................................22

*Phillips v. City of New York*,
    775 F.3d 538 (2d Cir. 2015)....................................................................................19

*Roberts v. Neace*,
    958 F.3d 409 (6th Cir. 2020) ...............................................................................18, 19, 21, 22

*Soos v. Cuomo*,
    2020 U.S. Dist. LEXIS 111808 (N.D.N.Y. June 26, 2020)....................................6, 16, 17, 22

*South Bay United Pentecostal Church v. Newsom*,
    140 S. Ct. 1613 (2020)...........................................................................................16, 17, 18

*Williams v. Annucci*,
    895 F.3d 180 (2d Cir. 2018).................................................................................................14

*Ward v. Polite*,
    667 F.2d 727 (6th Cir. 2012) ...............................................................................................18

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972).............................................................................................................12

## OTHER AUTHORITIES

U.S. CONST. amend. I............................................................................................................ *supra*

U.S. CONST. amend. XIV ............................................................................................................12

N.Y. Executive Order No. 202....................................................................................................5

N.Y. Executive Order No. 202.68.....................................................................................3, 4, 7, 8

Professor Josh Blackman, *New York Governor Cuomo: "I'm Going to Say to the
    Orthodox Community Tomorrow If You Don't Agree Then We Will Have to Close
    Down Your Religious Institutions*, Volokh Conspiracy (Oct. 6, 2020)
    https://reason.com/2020/10/06/new-york-governor-cuomo-im-going-to-say-to-the-
    orthodox-community-tomorrow-if-you-dont-agree-then-we-will-have-to-close-down-
    your-religious-institutions/.....................................................................................................1

Plaintiffs Agudath Israel of America, Agudath Israel of Kew Garden Hills, Agudath Israel of Madison, Agudath Israel of Bayswater, Rabbi Yisroel Reisman, Rabbi Menachem Feifer, and Steven Saphirstein (together, "Plaintiffs") respectfully submit this memorandum of law in support of their Motion for Temporary Restraining Order and Preliminary Injunction.  The Motion and this memorandum are supported by the Declarations of Rabbi Yisroel Reisman, Rabbi Menachem Feifer, Avrohom Weinstock, Aharon Weisenfeld, Steven Saphirstein, and Avi Schick, and the Exhibits attached thereto.

## INTRODUCTION

Granting this request for a temporary restraining order is essential to safeguarding the core religious practices of thousands of Orthodox Jews.  **Absent entry of a temporary restraining order on or before October 9, 2020, it will be _impossible_ for Plaintiffs and others to fully and properly observe the three Jewish holiday of Hoshana Rabbah, Shmini Atzeres, and Simchas Torah, which are observed on October 9–11, 2020.**

Two days before these holidays, Defendant banned thousands of Orthodox Jews from fulfilling a core an essential religious tradition that has been observed for more than 2,000 years.  In doing so, Defendant singled out this religious minority for public scorn at a press conference.  _See_ Professor Josh Blackman, _New York Governor Cuomo: "I'm Going to Say to the Orthodox Community Tomorrow If You Don't Agree Then We Will Have to Close Down Your Religious Institutions,_" The Volokh Conspiracy (Oct. 6, 2020) https://reason.com/2020/10/06/new-york-governor-cuomo-im-going-to-say-to-the-orthodox-community-tomorrow-if-you-dont-agree-then-we-will-have-to-close-down-your-religious-institutions/.

Defendant concedes that he has never enforced the already existing restrictions on houses of worship that Plaintiffs have fully complied with.  Defendant has never contended that Plaintiffs

have violated any capacity, distancing, masking, or other safety requirements.  There is simply no justification for the unwarranted, unnecessary and unconstitutional restrictions imposed this week.

*   *   *

Earlier this week, Defendant announced the imposition of restrictions on certain neighborhoods, including severe limitations on houses of worship.  In announcing the restrictions, Defendant singled out of houses of worship.   In particular, he singled out Orthodox Jews.  Defendant singled out "[r]eligious institutions" as "the greatest potential" threat to the spread of COVID-19, declaring that "[w]e know religious institutions have been a problem."  Declaration of Avi Schick ("Schick Decl.") Ex. A at 7.  Defendant did so despite recognizing that a "[l]ack of enforcement" by "[l]ocal governments" of existing restrictions has "contributed to this problem," emphasizing that "nobody's doing the enforcement" of COVID-19 restrictions, including "the bars and restaurants."  *Id.* at 8–9.

During his press conference, Defendant highlighted pictures of observant Jews as purportedly demonstrating "clear violations of social distancing," wrongly claiming the pictures were from "the recent past" (in fact, one photo was of a funeral in 2006).  *Id.* at 7; *see also* Schick Decl. Ex. B at 10.  Stating that he planned to "meet with members of the ultra-Orthodox community tomorrow," Defendant threatened that "we'll close the [religious] institutions down" if "you do not agree to enforce the rules."  Schick Decl. Ex. A at 8.

The next day, Defendant eschewed the logical step of enforcing the existing restrictions and instead imposing selective and discriminatory gathering restrictions on houses of worship.  The following chart identifying the restrictions was released during the press conference.

2

| Type of Activity | RED | ORANGE | YELLOW |
|---|---|---|---|
| Worship | 25% capacity 10 people maximum | 33% capacity 25 people maximum | 50% capacity |
| Mass Gathering | Prohibited | 10 people maximum, indoor and outdoor | 25 people maximum, indoors and outdoors |
| Businesses | Only essential businesses open | Closing high-risk non-essential business (gyms, personal care, etc.) | Open |
| Dining | Takeout only | Outdoor dining only, 4 person maximum per table | Indoor and outdoor dining, 4 person maximum per table |
| Schools | CLOSED Remote-only | | Open Mandatory weekly testing of students and teachers/staff for in-person settings. DOH will set percent by Friday. |

Schick Decl. Exs. C at 2, D at 1. As the chart indicates, Defendant's restrictions impose discriminatory limitations on houses of worship depending on their geographic location. *Id.* Late that night, Defendant issued Executive Order No. 202.68, implementing these restrictions and ordering that the restrictions "shall be effective immediately" and "shall be enforced no later than Friday, October 9, 2020[.]" Schick Decl. Ex. E at 2.

Defendant's restrictions violate Plaintiffs' constitutional right of the free exercise of religion, guaranteed by the First Amendment of the United States Constitution, for two independent reasons. First, Defendant's restrictions are facially discriminatory toward religious practice as compared to secular activities. In areas that are in the Yellow Zone, Defendant's restrictions limit houses of worship to 50% of their legal capacity while allowing similar secular activities to operate at greater capacities. In areas that are in the Orange Zone, Defendant restricts houses of worship to a 25-person maximum while permitting a range of similar secular activities to operate under less restrictive capacity limitations. In areas that are in the Red Zone, Defendant

limits houses of worship to a 10-people maximum while allowing "essential gatherings" and businesses to operate under more favorable restrictions.  In each of these zones, Defendant's restrictions are specifically directed at religious practice and thus are not neutral.

Second, Defendant's explicit targeting of religious institutions for restrictions demonstrates that his order infringes upon Plaintiffs' religious practices because of their religious nature.  Although Defendant recognized other activity may present similar or greater risks than houses of worship, Defendant admitted that the limitations single out religious practice for special treatment that the "rules are most impactful on houses of worship" because "[t]he problem is mass gatherings and houses of worship."  Schick Decl. Ex. F at 8.  Defendant threatened "religious institutions" and "members of the ultra-Orthodox community" that "[i]f you do not agree to enforce the rules, then we'll close the [religious] institutions down."  Schick Decl. Ex. A at 8.  Defendant's contemporaneous statements made while announcing his restrictions demonstrate that he impermissibly has singled out religious practice because of its religious nature.

Houses of worship are a critical component of the religious life of Jews.  Defendant's Executive Order No. 202.68 renders it impossible for Plaintiff synagogues and individuals and all of their congregants to fulfill their religious obligations.  Many of the Plaintiff' synagogues are located in the "red zone" of the restrictions, which limits worship services to 10 individuals, Declaration of Rabbi Yisroel Reisman ("Reisman Decl.") ¶ 6; Declaration of Steven Saphirstein ("Saphirstein Decl.") ¶ 6, or the "orange zone," which limited worship services to 25 individuals, Declaration of Rabbi Menachem Feifer ("Feifer Decl.") ¶ 5.  Under these restrictions, "it is impossible to conduct services for all of [Plaintiffs'] congregants" for the Jewish holidays observed on October 9–11, 2020, known as Hoshana Rabbah, Shmini Atzeres, and Simchas Torah, respectively.  Reisman Decl. ¶ 13; Feifer Decl. ¶ 12; Saphirstein Decl. ¶ 13.

4

If this Court does not grant immediate relief barring Defendant's restrictions, Plaintiffs will suffer irreparable harm because they will be prohibited from attending synagogue to practice their religious beliefs, which would be "particularly devastating" during the upcoming Jewish holiday period. Reisman Decl. ¶ 10; Feifer Decl. ¶ 9; Saphirstein Decl. ¶ 10. The irreparable injury caused by Defendant's restrictions will fall particularly harshly on Orthodox Jews, who do not use vehicular travel on Sabbath or religious holidays and thus are unable to travel to houses of worship unaffected by the Executive Order. Reisman Decl. ¶¶ 16–17; Feifer Decl. ¶¶ 15–16; Saphirstein Decl. ¶¶ 16–17. The public interest favors safeguarding Plaintiffs' constitutional rights.

## STATEMENT OF FACTS

**I.** **Defendant's Selective and Discriminatory Enforcement of COVID-19 Restrictions**

To combat the "transmission of COVID-19" and the "threat that COVID-19 poses to the health and welfare" of the State of New York, Defendant issued Executive Order No. 202 on March 7, 2020 declaring a disaster emergency in New York. Schick Decl. Ex. G at 1–3. In the following months, Defendant issued dozens of orders imposing business closures, in-person gathering restrictions, and other requirements throughout the State.

In May, the State announced that it would allow a phased, regional approach for non-essential businesses to reopen and other conduct to resume, based on regions satisfying certain health-related metrics specified by the New York Department of Health. *See generally* Schick Decl. Ex. H. Pursuant to that plan, Defendant has exempted non-essential businesses and other conduct from his gathering and closure restrictions in certain regions of the State, provided that such entities operate subject to Department of Health guidance. *Id.* Among other things, the Department of Health Guidance requires such businesses and other conduct to adhere to certain

health and safety protocols, which often include capacity limitations on maximum occupancy.  *Id.*
All regions of the State currently are in the final phase (Phase 4) of that plan.  *Id.*

For religious services in Phase 4, the State's guidelines impose a restriction of "no more
than 33% of the maximum occupancy for a particular area as set by the certification of occupancy
for services occurring indoor; or no more than 50 people for services occurring outdoors."  Schick
Decl. Ex. I at 2, 4.  In *Soos v. Cuomo*, 2020 U.S. Dist. LEXIS 111808 (N.D.N.Y. June 26, 2020),
the district court enjoined Defendant's earlier 25% indoor capacity limitation on houses of
worship, concluding that they imposed more restrictive capacity limitations to comparable secular
activity that allowed 50% capacity, such as "offices, retail stores that are not inside of shopping
malls, and salons," as well as restaurants, and restrained Defendant from enforcing such limitations
greater than those imposed for comparable activity.  *Id.* at *29–30, 35.

Two days ago, Defendant instituted new gathering restrictions designed to target religious
institutions.  During a press conference on October 5, 2020, Defendant singled out "[r]eligious
institutions" as "the greatest potential" threat, declaring that "[w]e know religious institutions have
been a problem."  *Id.*  Defendant showed pictures of religious gatherings while making these
statements, wrongly stating the pictures were from "the recent past."  *Id.*; Ex. B at 5.  Stating that
he planned to "meet with members of the ultra-Orthodox community tomorrow," Defendant
threatened that "we'll close the [religious] institutions down" if "you do not agree to enforce the
rules."  Schick Decl. Ex. A at 8.

The following day, Defendant again stated that "a COVID cluster problem" is "see[n] [ ]
in places of worship."  Schick Decl. Ex. F at 3.  Defendant declared that he intended his restrictions
to be "most impactful on houses of worship" because "[t]he problem is mass gatherings and houses
of worship."  *Id.* at 8.  Defendant did so despite recognizing that "a lack of enforcement" by "[l]ocal

governments" has "contributed to this problem," *id.* at 7–8, emphasizing that "nobody's doing the enforcement" of COVID-19 restrictions, including "the bars and restaurants," Schick Decl. Ex. A at 8–9.

Defendant declared that the restrictions "will be in effect for a minimum of 14 days." Schick Decl. Ex. F at 1, and that "[t]he state is going to take over the enforcement oversight in all the hotspot clusters."  Schick Decl. Ex. A at 9.

At approximately midnight on October 6, Defendant issued Executive Order No. 202.68 implementing the restrictions.  Schick Decl. Ex. E at 1–2.  In particular, in areas that are in the "Red Zone – Cluster Itself," Defendant restricts houses of worship to a 10-person maximum limit. *Id.* at 2.  The order imposes restrictions on "[n]on-essential gatherings of any size," but does not define or otherwise restrict "essential" gatherings.  *Id.*  The order likewise exempts essential businesses from the restrictions.  *Id.*

In areas that are in the "Orange Zone – Warning Zone," Defendant restricts houses of worship to a 25-person maximum limit.  *Id.*  Defendant exempts most businesses in this zone from any new restrictions, "[c]losing" only "non-essential businesses, for which there is a higher risk associated with the transmission of the COVID-19 virus[.]"  *Id.*

In areas Defendant determines are in the "Yellow Zone – Precautionary Zone," Defendant restricts houses of worship to 50% capacity.  Schick Decl. Ex. E at 2.  Defendant exempts all businesses, including restaurants for indoor and outdoor dining service, from these "Yellow Zone" restrictions.  *Id.*

Defendant's order provides that the "directive shall be effective immediately" and "shall be enforced no later than Friday, October 9, 2020."  *Id.*  The order likewise states that "any individual who encourages, promotes or organizes a non-essential gathering as set forth in

Department of Health regulation, shall be liable for a civil penalty not to exceed $15,000 per day[.]"   *Id.* at 1.   The restrictions currently apply to areas in the following counties:   Broome, Brooklyn, Orange, Queens, and Rockland.   Schick Decl. Ex. J at 8–13.

## II.   Defendant's Executive Order No. 202.68 Infringes Upon Orthodox Worship Services

Jewish houses of worship are a necessary and essential component of Orthodox Jewish life. Orthodox Jews pray in synagogues every day.   Reisman Decl. ¶ 2; Feifer Decl. ¶ 2; Saphirstein Decl. ¶ 2.   Services conducted on Saturdays and Jewish holidays are particularly important.   *Id.*   In the aggregate, Plaintiffs' synagogues serve tens of thousands of Orthodox Jews.   *See* Declaration of Aharon Weisenfeld ("Weisenfeld Decl.").   Many if not most of the individual synagogues serve several hundred men and woman each week, and have legal capacities that permit them to have several hundred worshippers in the building at any one time.   Reisman Decl. ¶ 2; Feifer Decl. ¶ 2; Saphirstein Decl. ¶ 2.

Defendant's Executive Order No. 202.68 renders it "impossible" for Plaintiffs' synagogues and their congregants to fulfill their religious obligations.   Reisman Decl. ¶ 5; Feifer Decl. ¶ 4; Saphirstein Decl. ¶ 5.   For synagogues in the "red zone," such as Plaintiff Agudath Israel of Madison and Agudath Israel of Kew Gardens Hills, the Executive Order would limit attendance at worship services to 10 individuals.   Reisman Decl. ¶ 6; Saphirstein Decl. ¶ 6.   For synagogues in the "orange zone," such as Plaintiff Agudath Israel of Bayswater, the Executive Order would limit attendance at worship services to 25 individuals.   Feifer Decl. ¶ 5.   Under these restrictions, "it is impossible to conduct services for all of Plaintiffs' congregants" for the three Jewish holidays observed on October 9–11, 2020.   Reisman Decl. ¶ 6; Feifer Decl. ¶ 5; Saphirstein Decl. ¶ 6.   These days are known as Hoshana Rabbah, Shmini Atzeres, and Simchas Torah, respectively.

This Friday, October 9, is the holiday of Hoshana Rabbah, which marks the conclusion of the Days of Judgment that began with Rosh Hashona.  Reisman Decl. ¶ 7; Feifer Decl. ¶ 6; Saphirstein Decl. ¶ 7.  There are special, additional services and rituals that are required of Jewish Practitioners that day.  *Id.*  In particular, there are seven additional prayers followed by the traditional beating of a willow branch in the synagogue.  *Id.*  This tradition dates back two thousand years, to the times of the Temple.  *Id.*  Services also require reading from a Torah scroll.  *Id.*  These services take at least ninety minutes to one hundred and fifty minutes.  Reisman Decl. ¶ 8; Feifer Decl. ¶ 7; Saphirstein Decl. ¶ 8.

Defendant's restrictions render it impossible for Plaintiffs and other Orthodox Jews to participate in services on Hoshanna Rabba.  With services limited to ten attendees, it would require more than twenty separate services, each lasting at least ninety to one hundred twenty minutes, on Friday morning.  *Id.*  That is simply not possible.  By contrast, under the existing COVID-19 rules, Plaintiffs "could utilize all the various spaces of our synagogue to have four services, using indoor and outdoor space."  Reisman Decl. ¶ 9; Feifer Decl. ¶ 8; Saphirstein Decl. ¶ 9.

This Saturday, October 10, is the holiday of Shmini Atzeres.  Services on this day include Yizkor, which is the Prayer for Departed Relatives.  Reisman Decl. ¶ 10; Feifer Decl. ¶ 9; Saphirstein Decl. ¶ 10.  This prayer is only recited four times a year, and the next recitation is not until Passover, in April.  *Id.*  These additional prayers by men and woman alike are particularly emotional, are led by the Rabbi, take an additional fifteen minutes and are only offered only in group (rather than individual) prayer.  *Id.*  It would be "particularly devastating" for congregants to be deprived of this prayer on Saturday.  *Id.*

Shmini Atzeres is also the only day of the year when Orthodox synagogues read Ecclesiastes, which Orthodox Jews accept as the Book of Wisdom.  Reisman Decl. ¶ 11; Feifer

Decl. ¶ 10; Saphirstein Decl. ¶ 11.  In Plaintiffs' synagogues, it is read from a parchment and requires a trained cantor.  *Id.*  Under Defendant's order, it is impossible for Plaintiffs and other Orthodox Jews to engage in the Prayer for Departed Relatives and to comply with the Jewish law requirements to read Ecclesiastes in a congregate setting.  *Id.*  Under the existing COVID-19 rules, however, Plaintiffs would be permitted to engage in such conduct.  *Id.*

This Sunday, October 11 is Simchas Torah, which has a literal translation of Joy of the Torah.  Reisman Decl. ¶ 12; Feifer Decl. ¶ 11; Saphirstein Decl. ¶ 12.  In celebration of the completion of the annual cycle of Torah readings, each congregant is called to the Torah for a short reading.  *Id.*  The Rabbi is then traditionally called to read the final portion of the Torah, after which the first portion of the Torah is read.  *Id.*  These Torah readings, in addition to the regular services, take time.  *Id.*  It is impossible for Plaintiffs to conduct services for all of their congregants on Simchas Torah if they are limited to ten worshippers, as there "simply is not enough time to do even the Torah readings required of the day, let alone the services."  Reisman Decl. ¶ 13; Feifer Decl. ¶ 12; Saphirstein Decl. ¶ 13.  Yet Plaintiffs "would be able to comply with both our religious and civil dictates if the existing [COVID-19] capacity restrictions remain in place through this holiday period."  Reisman Decl. ¶ 14; Feifer Decl. ¶ 13; Saphirstein Decl. ¶ 14.

Because Orthodox Jews are prohibited from vehicular travel on Saturdays and religious holidays, Defendant's restrictions also disproportionately impact Jewish Orthodox services. Synagogues are tightly clustered around where practitioners reside. Reisman Decl. ¶ 16; Feifer Decl. ¶ 156; Saphirstein Decl. ¶ 16; Weisenfeld Decl. ¶ 5.  While Orthodox Jews can continue to drive to work or engage in other permitted activity outside of prohibited zones, the restrictions bar Orthodox Jews principally from attending religious services, as they are unable to travel to synagogues outside of their restricted zones.  Reisman Decl. ¶ 17; Feifer Decl. ¶ 16; Saphirstein

Decl. ¶ 17; Weisenfeld Decl. ¶ 5.  While practitioners of other faiths retain the option to drive to nearby houses of worship outside of their restricted zones, Orthodox Jews are unable to do so. Reisman Decl. ¶ 17; Feifer Decl. ¶ 16; Saphirstein Decl. ¶ 17.

Additionally, there are hundreds of synagogues in the areas affected by Defendant's restrictions, Weisenfeld Decl. ¶¶ 2–3, 6, and tens of thousands of Orthodox Jews in New York live within the areas affected by Defendant's restrictions, *id.* at ¶ 4.  Thus, the brunt of the religious burden that Defendant's executive order imposes is on Orthodox Jewish worshippers, who are totally deprived of the ability to participate in religious services.  Reisman Decl. ¶¶ 16–18; Feifer Decl. ¶¶ 15–17; Saphirstein Decl. ¶¶ 16–18.

## III.   **Plaintiffs' Houses of Worship Protect from the Transmission of COVID-19**

Plaintiffs' houses of worship have adopted health protocols and have altered religious congregation to safeguard against the spread of COVID-19.  Plaintiffs' synagogues have been fully compliant with all mandates issued by the State and New York City since the onset of the pandemic.  Reisman Decl. ¶ 3; Feifer Decl. ¶ 3; Saphirstein Decl. ¶ 3.  Among other things, Plaintiffs have split the traditional congregational service into several separate gatherings, which accommodates every congregant while still ensuring that congregants maintain proper social distancing.  *Id.*  Plaintiffs require congregants to wear masks during the entirety of their religious services, and congregants have fully complied with the mask policy.  *Id.*

By implementing rigorous health and safety protocols, Plaintiffs have been able to allow their members to continue to practice their religious beliefs while still safeguarding from the spread of COVID-19.  Since Defendant has conceded that there has been no enforcement against those who have failed to comply with the existing rules, he should have demanded enforcement of those rules rather than imposing punitive and discriminatory new rules in the Executive Order.

**ARGUMENT**

In the Second Circuit, the standard for issuance of a temporary restraining order and a preliminary injunction are the same. *Chestnut Hill NY, Inc. v. City of Kingston*, 2017 U.S. Dist. LEXIS 226807, at *2 (N.D.N.Y. Feb. 22, 2017). When pursuing injunctive relief against regulation taken in the public interest, a plaintiff must demonstrate: (1) a likelihood of success on the merits; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of the hardships tips in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction. *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (citation omitted). "A showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'" *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)).

**I.    The Restrictions on Houses of Worship in the Executive Order Are Unconstitutional**

Plaintiffs are likely to prevail on their claim that Defendant's restrictions on gathering in houses of worship violate Plaintiffs' First Amendment right to the free exercise of religion for two independent reasons. First, Defendant's restrictions impermissibly discriminate against religious practice while simultaneously permitting comparable secular conduct. Second, Defendant's restrictions similarly violate Plaintiffs' Free Exercise rights because they inappropriately target conduct because of their religious motivation.

**A.    The Right to the Free Exercise of Religion Exists Even During COVID-19**

The First Amendment to the United States Constitution, through the Fourteenth Amendment, forbids States from enacting laws providing for the establishment of religion or prohibiting the free exercise of religion. *See Wisconsin v. Yoder*, 406 U.S. 205, 214 (1972).

Laws burdening the free exercise of religion that are not neutral or generally applicable are subject to "the most rigorous of scrutiny." *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 546 (1993).  A law can lack neutrality toward religion in two independent ways, both applicable here.

*First*, a law is "not neutral" where "the religious ritual it regulates is 'the only conduct subject to' the" restriction by that restriction's text.  *Cent. Rabbinical Congress of the U.S. & Can. v. NYC Dep't of Health & Mental Hygiene*, 763 F.3d 183, 195 (2d Cir. 2014) (quoting *Lukumi*, 508 U.S. at 535).  That is, a law is not neutral "if it is 'specifically directed at [a] religious practice.'"  *Id.* at 193 (quoting *Employment Div., Dep't of Human Res. of Ore. v. Smith*, 494 U.S. 872, 878 (1990)).

Second, a law that restricts practice because of its religious *motivation* similarly is not neutral towards religion, even if its text appears neutral.  To determine whether a law is facially discriminatory toward religious practice, a court should analyze "objective factors [that] bear on the question of *discriminatory object*," such as "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body."  *Lukumi*, 508 U.S. at 540 (emphasis added and citation omitted).

A State "cannot impose regulations that are hostile to the religious beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs or practices."  *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018), because "[t]he Free Exercise Clause bars even 'subtle departures from neutrality' on matters of religion."  *Id.* (quoting *Lukumi*, 508 U.S. at 534).  Religious individuals and institutions are "entitled to a neutral decisionmaker who would give full and fair

13

consideration" to religious beliefs; thus, disparate consideration of religious practice compared to secular practice fails to act in a manner neutral toward religion. *Id.* at 1729, 1732.

To satisfy the "'exceptionally demanding'" strict scrutiny test applicable to laws that are not neutral toward religion, either by their text or motivation, *Holt v. Hobbs*, 574 U.S. 352, 364 (2015) (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 728 (2014)), the State must show that the law "advance[s] 'interests of the highest order' and [is] narrowly tailored in pursuit of those interests," *Lukumi*, 508 U.S. at 546 (quoting *McDaniel v. Paty*, 435 U.S. 618, 628 (1978)). Laws "will survive strict scrutiny only in rare cases." *Id.*

A law fails to advance a compelling interest where government "fails to enact feasible measures to restrict other conduct producing substantial harm or alleged harm of the same sort" as the restricted religious activity. *Id.* at 546–47. A law is not narrowly tailored if "'less restrictive means [are] available for the Government to achieve its goals[.]'" *Holt*, 574 U.S. at 365 (quoting *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 815 (2000)). A law's "underinclusiveness suggests . . . that a more tailored policy, less burdensome to [religious practice], is possible." *Williams v. Annucci*, 895 F.3d 180, 193 (2d Cir. 2018); *see also Holt*, 574 U.S. at 367–38; *Lukumi*, 508 U.S. at 546.

### B. The Executive Order's Restrictions on Worship Are Unconstitutional

1. By imposing gathering restrictions on houses of worship, Defendant has burdened Plaintiffs' sincerely held religious beliefs. Plaintiffs are sincere practitioners of Judaism who believe that attending religious services at the synagogue provides a critical facet to the religious practices and beliefs of Jewish individuals. As discussed above, *see supra* 8–11, Defendant's restrictions render it "practically impossible" for Plaintiffs "to conduct services for all of [their] congregants" for the Jewish holidays observed on October 9–11, 2020, thereby infringing upon

Plaintiffs' ability to "comply with" religious dictates.   Reisman Decl. ¶ 6; Feifer Decl. ¶ 5; Saphirstein Decl. ¶ 6.  Because Defendant has restricted the number of individuals that may gather at houses of worship, rendering such conduct illegal and subject to penalty, Defendant has deprived Plaintiffs of their ability to act in accordance with their sincerely held religious beliefs.

2.a. Defendant's restrictions are not neutral because they are *facially discriminatory*. Defendant's restrictions in each zone expressly impose gathering restrictions on "houses of worship" and not other secular conduct.  Schick Decl. Ex. E at 2.

In areas designated to be in the "Yellow Zone," Defendant restricts houses of worship to 50% capacity while permitting all businesses, including restaurants for indoor and outdoor dining service, and schools, to remain open.  *Id.*  These restrictions thus facially target religious practice because they are "specifically directed at [a] religious practice."  *Cent. Rabbinical*, 763 F.3d at 193, 195.  Defendant's order allows schools, including higher education, to remain open at full capacity in these regions.  *See generally* Schick Decl. Ex. K.  This secular conduct that Defendant's order permits to open at greater capacity than 50% similarly constitute gatherings of individuals for a prolonged period of time—the very characteristics of public congregation used to justify restrictions to combat the transmission of COVID-19.

In areas designated to be in the "Orange Zone," Defendant restricts worship services to a maximum of 25 people while "[c]losing" only "non-essential businesses, for which there is a higher risk associated with the transmission of the COVID-19 virus[.]"  Schick Decl. Ex. E at 2. The capacity restrictions on houses of worship in this zone likewise facially target religious practice.  The "non-essential" businesses that Defendant's order permits to open at greater capacity than houses of worship include offices, malls, and retail stores, which Defendant allows to open at 50% capacity.  *See generally* Schick Decl. Exs. L, M.  These favored secular activities similarly

constitute gatherings of individuals for a prolonged period of time that should trigger the same concerns relating to the spread of COVID-19 that Defendant claims justifies restrictions on houses of worship.  Yet Defendant's restrictions on houses of worship in this zone facially target religious practice, and not such secular conduct.

Indeed, in enjoining Defendant's 25% capacity restriction on houses of worship this summer, Judge Sharpe in *Soos* concluded that exempted secular activity such as offices "threaten defendants' interest in slowing the spread of COVID-19 to a similar or greater degree than" houses of worship. 2020 U.S. Dist. LEXIS 111808, at *29–30.  The reasoning in *Soos* applies here.  Thus, by implementing gathering restrictions only on religious practice, Defendant's order is "not neutral" because "the religious ritual it regulates is 'the only conduct subject to' the" restriction. *Cent. Rabbinical*, 763 F.3d at 193, 195 (quoting *Lukumi*, 508 U.S. at 535).

In areas designated to be in the "Red Zone – Cluster Itself," Defendant restricts houses of worship to a 10-person maximum.  Schick Decl. Ex. E at 2.  These restrictions similarly facially target religious practice.  *Cent. Rabbinical*, 763 F.3d at 193, 195.  Moreover, while Defendant's order exempts all essential gatherings and businesses from such restrictions, Schick Decl. Ex. E at 2, it fails to define "essential" gatherings not subject to the gathering restrictions.

The denial of application for emergency injunctive relief in *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020), does not direct a different result.  At issue in *South Bay* was a challenge to state law limiting capacity on houses of worship while exempting other secular conduct from those restrictions.  *Id.* at 1613.  Chief Justice Roberts reasoned that the permitted conduct at issue was "dissimilar" to houses of worship, where "large groups of people gather in close proximity for extended periods of time," because individuals in those secular activities, such as "grocery stores, banks, and laundromats" do not "congregate in large groups nor

16

remain in close proximity for extended periods." *Id.* (Roberts, C.J., concurring in the denial of application for injunctive relief). In contrast, the permitted secular conduct at issue here does involve "large groups of people [who] gather in close proximity for extended periods of time." *Id.* Judge Sharpe similarly held that offices "threaten defendants' interest in slowing the spread of COVID-19 to a similar or greater degree than those of" houses of worship, and *South Bay* did not apply. *Soos*, 2020 U.S. Dist. LEXIS 111808, at *29–30. And neither *Soos* nor *South Bay* considered permitted secular conduct relating to schools and higher education, which plainly involve congregations of large groups of individual in close proximity with one another for extended periods of time.

b. Defendant's Executive Order is also not neutral because it infringes on the religious practices of the Orthodox Jewish community because of their religious motivation. The day before issuing his restrictions, Defendant singled out houses of worship for discriminatory treatment: "Religious institutions are mass gatherings and raise the greatest potential" for the spread of COVID-19, stating that "[w]e know religious institutions have been a problem." Schick Decl. Ex. A at 7. Defendant threatened "religious institutions" and "*members of the ultra-Orthodox community*" that "[i]f you do not agree to enforce the rules, then we'll close the [religious] institutions down." *Id.* at 8 (emphasis added).

Defendant's "contemporaneous statements" made when issuing his restrictions on houses of worship demonstrate the "discriminatory object" of the restrictions as singling out religious practice, Orthodox Jewish practice in particular, "because of their religious motivation." *Lukumi*, 508 U.S. at 533, 540 (citation omitted). Indeed, Defendant's order requires enforcement of his restrictions beginning October 9—the beginning of the Jewish holidays, Reisman Decl. ¶ 7; Feifer Decl. ¶ 6; Saphirstein Decl. ¶ 7, that ensures it will be "impossible" for Plaintiffs and other

Orthodox Jews to conduct and participate in services. Reisman Decl. ¶ 5; Feifer Decl. ¶ 4; Saphirstein Decl. ¶ 5.  And the brunt of Defendant's restrictions fall disparately on Orthodox Jews, who do not use vehicular travel on Sabbath or on religious holidays and thus are unable to travel to houses of worship for religious practice in permitted areas.  Reisman Decl. ¶ 16; Feifer Decl. ¶ 15; Saphirstein Decl. ¶ 16.  Defendant's conduct demonstrates that he failed to act as a "neutral decisionmaker" to religious practice and did not act in a manner neutral to religion. *Masterpiece Cakeshop*, 138 S. Ct. at 1729, 1732.

3. Defendant cannot satisfy the "'exceptionally demanding'" strict scrutiny test, *Holt*, 574 U.S. at 364 (quoting *Hobby Lobby*, 573 U.S. at 728).  Although the State has an undisputed interest in stemming the transmission of COVID-19, the gathering restrictions targeted at houses of worship are not narrowly tailored.  "'[L]ess restrictive means'" clearly are available for the State to diminish the transmission of COVID-19.  *Holt*, 574 U.S. at 365 (quoting *Playboy*, 529 U.S. at 815).  The regulation is massively "underinclusive in relation to its asserted secular goals[.]" *Cent. Rabbinical*, 763 F.3d at 186.  The exempted secular activity, for all businesses, restaurants, and schools in areas in the Yellow Zone and for most businesses in areas in the Orange Zone, in which individuals congregate and remain in close proximity for long periods, endangers the health and welfare of the public through the transmission of COVID-19 "in a similar or greater degree than" do houses of worship, *Lukumi*, 508 U.S. at 543.  That plainly proves the regulation's "underinclusive" nature. *Id.* at 542–43; *see also S. Bay*, 140 S. Ct. at 1613 (Roberts, C.J., concurring in the denial of application for injunctive relief); *Roberts v. Neace*, 958 F.3d 409, 413–15 (6th Cir. 2020); *Ward v. Polite*, 667 F.2d 727, 738–39 (6th Cir. 2012).  Such underinclusiveness demonstrates that the State's interest could be furthered by similarly permitting houses of worship that implement health protocols comparable to those required of comparable secular activity. *See*

*Roberts*, 958 F.3d at 415; *Holt*, 574 U.S. at 367–68; *Lukumi*, 508 U.S. at 546.  Defendant's restrictions on houses of worship thus fails strict scrutiny.

4. Even if strict scrutiny did not apply, Defendant's restrictions on houses of worship still fails.  The Supreme Court's holding in *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905), that a regulation to "protect the public health and the public safety" is unconstitutional only if it is "arbitrary and oppressive" or "has no real or substantial relation to [protect public health], or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law," *id.* at 25, 31, 38 (citations omitted), does not alter traditional Free Exercise Clause scrutiny. *See Phillips v. City of New York*, 775 F.3d 538, 543 (2d Cir. 2015); *see also Roberts*, 958 F.3d at 413–15.  "Language in *Jacobson* must be read in context, and it is important to keep in mind that *Jacobson* primarily involved a substantive due process challenge[,]" and "[i]t is a considerable stretch to read the decision as establishing the test to be applied when statewide measures of indefinite duration are challenged under the First Amendment[.]" *Calvary Chapel Dayton Vall. v. Sisolak*, 140 S. Ct. 2603, 2608 (2020) (Alito, J., dissenting from denial of application for injunctive relief).

Even if *Jacobson* did apply to Plaintiffs' Free Exercise Clause claim, Defendant's discriminatory conduct would not survive review.  As discussed above, the restrictions impose limits on houses of worship while simultaneously allowing gatherings of more individuals for comparable secular activity and businesses.  Defendant's restrictions singling out religious conduct for restriction on gathering is "arbitrary and oppressive" and an "palpable invasion of rights secured by fundamental law." *Jacobson*, 197 U.S. at 31, 38.  This is especially so because Defendant never bothered to enforce the existing restrictions before issuing these punitive new

restrictions.  This demonstrates that the Executive Order was driven by pique toward religion and not concern for public health.

## II.    <u>**Plaintiffs Will Suffer Irreparable Harm in the Absence of Injunctive Relief**</u>

Defendant's restrictions violate Plaintiffs' constitutional rights and will cause irreparable harm.  Courts presume irreparable harm where there exists a threatened violation of constitutional rights.  *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996).  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.); *see also LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 426 (2d Cir. 1995).

Closure of houses of worship would require Plaintiffs to sacrifice religious practice. Plaintiffs are sincere practitioners of Judaism who wish to worship in synagogue.  But the limits proscribed by Defendant's restrictions makes such worship impossible.  Reisman Decl. ¶ 5; Feifer Decl. ¶ 4; Saphirstein Decl. ¶ 5.

The irreparable injury Plaintiffs will suffer is particularly grave during the upcoming Jewish holidays from October 9–11, as Defendant's restrictions make it "impossible" for Plaintiffs to engage in critical religious practices.  Reisman Decl. ¶¶ 5–6; Feifer Decl. ¶¶ 4–5; Saphirstein Decl. ¶¶ 5–6.  It would be "particularly devastating" for congregants to be deprived of engaging in communal prayer and rituals during the holiday services.  Reisman Decl. ¶ 10; Feifer Decl. ¶ 9; Saphirstein Decl. ¶ 10.  If relief is granted, Plaintiffs "would be able to comply with both our religious and civil dictates if the existing capacity restrictions remain in place through this holiday period."  Reisman Decl. ¶ 14; Feifer Decl. ¶ 13; Saphirstein Decl. ¶ 14.  Plaintiffs are fearful of prosecution for holding such services, given that Defendant has threatened to impose fines of up to $15,000 upon "any individual who encourages, promotes or organizes a" worship service

attended by more than the limited number of individuals set forth in the Executive Order.  Schick Decl. Ex. E at 1.

Defendant's restrictions deprive Plaintiffs of their constitutional rights to exercise their religious beliefs by attending worship services.  Plaintiffs would suffer irreparable harm in the absence of an injunction, *Elrod*, 427 U.S. at 473; *Jolly*, 76 F.3d at 482; *LeBlanc-Sternberg*, 67 F.3d at 426, and a subsequent award of damages cannot undo or compensate for that harm.

## III.   The Balance of the Hardships Tips in Plaintiffs' Favor

The balance of the hardships also favors granting the requested injunction.  As demonstrated above, Plaintiffs will suffer irreparable harm in the absence of injunctive relief.

By contrast, Defendant will suffer no meaningful harm if the Court issues the injunction. Plaintiffs have guarded against the spread of COVID-19 and have been fully compliant with all State and local mandates since the onset of the pandemic.  Reisman Decl. ¶ 3; Feifer Decl. ¶ 3; Saphirstein Decl. ¶ 3.  Plaintiffs have implemented health and safety protocols that include, among other things, requiring congregants to wear masks during services and splitting services into small gatherings to ensure proper social distancing.  *Id.*  By adhering to these rigorous health and safety protocols, Plaintiffs have ensured no outbreak of COVID-19 has occurred among their congregants.  *Id.*  Plaintiffs simply seek injunctive relief that "appropriately permits religious services with the same risk-minimizing precautions as similar activities."  *Roberts*, 958 F.3d at 416.  The balance of the equities thus plainly favors Plaintiffs.  During any injunction period, Defendant can enforce the existing restrictions that he concedes he has never bothered to enforce.

## IV.   Injunctive Relief Would Serve the Public Interest

Injunctive relief would benefit the public interest in protecting Plaintiffs' constitutional rights and in treating religious and secular conduct in comparable ways.  "[S]ecuring First

Amendment rights is in the public interest." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (citation omitted).  And "treatment of similarly situated entities in comparable ways serves public health interests at the same time it preserves bedrock free-exercise guarantees." *Roberts*, 958 F.3d at 416 (citation omitted); *see also Soos*, 2020 U.S. Dist. LEXIS 111808, at *34. Injunctive relief would serve the public interest given the irreparable injury to Plaintiffs and the lack of constitutionally-sufficient justification for infringing their constitutional rights.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' requests for a temporary restraining order and preliminary injunction.

This 8th day of October, 2020.

Avi Schick
avi.schick@troutman.com

TROUTMAN PEPPER HAMILTON SANDERS LLP
875 Third Avenue
New York, NY  10022
(212) 704-6000

Misha Tseytlin (NY Bar No. 4642609)
misha.tseytlin@troutman.com
*Pro Hac Vice Application Forthcoming
W. Alex Smith (Ga. Bar No. 532647)
alex.smith@troutman.com
*Pro Hac Vice Application Forthcoming
Sean T.H. Dutton (IL Bar No. 6319132)
sean.dutton@troutman.com
*Pro Hac Vice Application Forthcoming
Kevin M. LeRoy (WI Bar No. 1105053)
kevin.leroy@troutman.com
*Pro Hac Vice Application Forthcoming

*Attorneys for Plaintiffs*