UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

AGUDATH ISRAEL OF AMERICA, AGUDATH
ISRAEL OF KEW GARDEN HILLS, AGUDATH
ISRAEL OF MADISON, AGUDATH ISRAEL OF
BAYSWATER, RABBI YISROEL REISMAN,
RABBI MENACHEM FEIFER, STEVEN
SAPHIRSTEIN,

No. 20-cv-04834

               Plaintiffs,

     -against-

Andrew M. Cuomo, *Governor of the State of New York
in his official capacity,*

               Defendant.

---

# GOVERNOR ANDREW M. CUOMO'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

LETITIA JAMES
Attorney General of the State of New York
*Attorney for Defendant Andrew M. Cuomo*
28 Liberty Street
New York, New York 10005

TODD A. SPIEGELMAN
ERIN R. MCALISTER
MARYAM JAZINI-DORCHEH
Assistant Attorneys General
  of Counsel

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................... 1

FACTUAL BACKGROUND ...................................................................................... 2

A.    The COVID-19 Pandemic And The State's Early Response ................................ 3

B.    New York's Phased Reopening ......................................................................... 4

C.    The Pandemic Is Not Over ............................................................................... 5

THE PRESENT LAWSUIT AND MOTION FOR A TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION ......................................................... 8

STANDARD OF REVIEW ....................................................................................... 9

ARGUMENT ........................................................................................................... 10

I.    PLAINTIFF CANNOT ESTABLISH A LIKELIHOOD OF SUCCESS ON THE
      MERITS ........................................................................................................... 10

      A.    The Executive Order Should Be Upheld Under The *Jacobson* Standard ...................... 10

      B.    The Executive Order Does Not Violate The First Amendment .................................... 14

            1.    The Executive Order Is Facially Neutral And Does Not Prevent Plaintiffs' Free
                  Exercise Of Religion ........................................................................ 14

            2.    The Executive Order Does Not Discriminate Against Religious Practice
                  Because It Does Not Permit "Comparable" Secular Conduct ............................... 16

            3.    The Executive Order Does Not Target Conduct Because Of Its Religious
                  Motivation, Nor Does It Target The Orthodox Jewish Community ........................ 19

            4.    Even If Strict Scrutiny Applies – Which It Does Not – Plaintiffs' Claims
                  Would Still Fail ............................................................................. 20

II.   THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH IN
      FAVOR OF NEW YORK'S MISSION TO PROTECT ITS CITIZENS FROM A
      GLOBAL PANDEMIC ...................................................................................... 22

III.  PLAINTIFF HAS NOT SHOWN A LIKELIHOOD OF IRREPARABLE HARM ............. 24

CONCLUSION ....................................................................................................... 25

Defendant Andrew M. Cuomo, sued in his official capacity as Governor of the State of New York ("Governor Cuomo" or "Governor"), respectfully submits this memorandum of law, together with the accompanying Declaration of Howard Zucker ("Zucker Decl.")[1] in opposition to Plaintiffs' motion for a temporary restraining order and preliminary injunction, ECF No. 2.

## PRELIMINARY STATEMENT

The State of New York, along with the rest of the world, continues to confront the greatest public health crisis in living memory. The COVID-19 pandemic has caused over 16,000 deaths in New York City alone—an enormous number that could have been far higher had the State not taken urgent action to halt the spread of the virus by mandating temporary restrictions on businesses and social gatherings. Thanks to these measures, New York was able to flatten the curve for new infections and fatalities and is now working toward lifting restrictions in a measured way, balancing the lives, health, and safety of its citizens with the need to protect their livelihoods. But the danger of a resurgence in cases remains clear and present, and certain areas of the State are already seeing such a resurgence. As a result, Governor Cuomo issued Executive Order 202.68 ("EO 202.68") in order to target and restrict gatherings in these hot spots and to stop any spikes in cases before they increase exponentially, as happened earlier in the year.

By this lawsuit, Plaintiffs would unfortunately hamper these efforts by enjoining Governor Cuomo's Executive Order designed to quash the developing case spikes in these COVID-19 hot spots. Plaintiffs, an Orthodox Jewish organization, synagogues and rabbis, seek a temporary restraining order and preliminary injunction against EO 202.68. They urge the Court to overlook the rising COVID-19 cases so to ensure they can have large gatherings over the upcoming Jewish holidays, even while COVID-19 cases are increasing significantly in their

---

[1] In the revised brief, the name of the declarant has changed from Dr. Elizabeth M. Dufort to Howard A. Zucker, the Commissioner of the Department of Health, and paragraphs cites to the Zucker Declaration were corrected.

neighborhoods and despite the risks posed by potential super-spreading events. Plaintiffs' motion is fatally flawed because it cannot meet *any* of the elements required to obtain preliminary relief.

First, there is no clear or substantial likelihood of success on the merits. *See* Point I, *infra*. Plaintiffs' case fails because the Executive Order is rationally related to the government's critical interest in avoiding spikes in COVID-19 cases and the concomitant threat to public health. In addition, Plaintiffs flatly err in claiming that EO 202.68 targets religious gatherings, and the Orthodox Jewish community specifically, or has less restrictive limitations for secular activities. Regardless, even if strict scrutiny applied here (and it does not), the fight against COVID-19 is a governmental interest of the highest order, and the Executive Order is narrowly tailored to meet that interest because it focuses on restricting gatherings in and around areas where the pandemic cases are spiking.

Second, the balance of equities and the public interest tip overwhelmingly in favor of New York's mission to protect New Yorkers from the imminent dangers presented by COVID-19. *See* Point II, *infra*.

Finally, Plaintiffs cannot establish irreparable harm, given that EO 202.68 permits religious gatherings in all three impacted zones just with restricted capacity. *See* Point III, *infra*.

Accordingly, Plaintiffs' motion for a temporary restraining order and preliminary injunction should be denied.

## FACTUAL BACKGROUND

The ongoing COVID-19 pandemic has caused over 25,000 deaths in New York State, over 16,000 of which were in New York City alone, and hundreds of thousands of deaths

worldwide.[2] New York was, for much of this spring, the global epicenter of the crisis.[3] Thanks to the lifesaving efforts of medical professionals, essential workers, state and local governments, and ordinary New Yorkers who have heeded calls to shelter-in-place and practice social distancing, this State's daily death toll has been reduced from a peak of approximately 800 per day to an average of less than 10 per day.[4] The threat is not over, however, as hundreds of New Yorkers remain hospitalized.[5] Continued vigilance is essential in order to prevent a deadly second wave of the pandemic from afflicting the State and requiring additional extensive shutdowns of schools and businesses. *See generally* Zucker Decl. ¶¶ 46-7.

### A. The COVID-19 Pandemic And The State's Early Response

COVID-19 is a highly infectious and potentially deadly respiratory disease caused by a newly discovered coronavirus that spreads easily from person-to-person. Zucker Decl. ¶ 8, Ex. B. Because there is no pre-existing immunity against this new virus, it has spread worldwide in an exceptionally short period of time. On January 31, 2020, the World Health Organization ("WHO") declared a "public health emergency of international concern." Zucker Decl. ¶ 10, Ex. C. Less than two months later, on March 11, 2020, WHO characterized the COVID-19 outbreak as a pandemic. Zucker Decl. ¶ 11, Ex. D.

On March 7, 2020, pursuant to N.Y. Exec. Law § 29, Governor Cuomo issued Executive Order 202, implementing the State Comprehensive Emergency Management Plan and declaring a statewide disaster emergency. Zucker Decl. Ex. I. By Executive Order 202, the Governor suspended all State and local laws, rules, and regulations to the extent necessary to address the

---

[2] Fatalities, New York State Department of Health ("DOH"), https://covid19tracker.health.ny.gov/views/NYS-COVID19-Tracker/NYSDOHCOVID-19Tracker-Fatalities?:embed=yes&:toolbar=no&:tabs=n.
[3] *See* https://nyti.ms/3kUJgbs.
[4] *See* New York, Covid Tracking Project, https://covidtracking.com/data/state/new-york#historical.
[5] *See id.*

COVID-19 emergency. *Id*. Following the issuance of Executive Order 202, Governor Cuomo issued multiple supplemental Executive Orders, continuing the temporary suspension and modification of certain laws relating to the state of emergency. *See, e.g.*, Zucker Decl. ¶¶ 30-7.

Among the more important measures the Governor adopted as part of the New York on PAUSE initiative were restrictions on non-essential gatherings. Specifically, on March 23, 2020, the Governor issued Executive Order 202.10, which banned "[n]on-essential gatherings of any size for any reason." Zucker Decl. Ex. M.

### B.    New York's Phased Reopening

Over the course of May and June, as the State's infection and death rates began to stabilize and then decline, New York transitioned from the "New York on PAUSE" initiative to the "New York Forward" initiative, a phased plan to guide the reopening of non-essential businesses. Zucker Decl. ¶¶ 39-42. The New York Forward initiative was intended to begin reopening New York's economy in a slow, measured way that would prevent any new spikes in COVID-19 cases. Zucker Decl. ¶¶ 39-42.

On May 21, 2020, Governor Cuomo issued Executive Order 202.32, as part of the phased re-opening to permit non-essential outdoor gatherings of up to ten individuals for religious services or Memorial Day service or commemoration, provided the participants follow the social distancing and cleaning and disinfection protocols established by the New York State Department of Health ("DOH"). Zucker Decl. Ex. N.

The following day, May 22, 2020, the Governor issued Executive Order 202.33, which further modified the ban to permit non-essential outdoor gatherings of up to ten individuals for any lawful purpose or reason, provided the participants follow the social distancing and cleaning and disinfection protocols established by DOH. Zucker Decl. Ex. O.

On June 15, 2020, the Governor issued Executive Order 202.42, which extended

4

Executive Order 202.33 until July 15, 2020, and further modified the restriction to permit non-essential outdoor gatherings of up to twenty-five individuals for any purpose or reason, provided the gathering was in a region that had reached Phase Three of the re-opening plan and the participants follow the social distancing, and cleaning and disinfection protocols established by DOH. Zucker Decl. Ex. P. Also on June 15, 2020, the Governor issued Executive Order 202.45, which permits non-essential gatherings of up to 50 individuals for any purpose or reason, provided the gathering is in a region that has reached phase four of the re-opening plan, and the participants follow the social distancing, cleaning, face covering, and disinfection protocols established by DOH. Zucker Decl. Ex. Q.

Through this measured reopening plan, which has been data-driven and guided by public health experts, the State was able to keep the daily number of new infections and new deaths relatively flat at a time when cases were spiking throughout the rest of the country. Zucker Decl. ¶¶ 42-46.

C. **The Pandemic Is Not Over**

Nevertheless, with the colder weather looming in due to the fall season, there is a greater potential for super-spreader gatherings where one individual can infect many others. Super-spreader events tend to happen in indoor spaces, with people in close proximity. Social occasions lead to more clusters than exposure in the workplace or home, and mass transmissions have occurred at weddings, temples, bars, and karaoke parties. And the risk is even higher if people are raising their voices in some way, such as singing or shouting. Zucker Decl. ¶ 65. Notably, the more people an individual interacts with at a gathering and the longer the interaction lasts, the higher the risk of becoming infected with COVID-19 and of the disease spreading. Zucker Decl. ¶ 67. The spread of the disease expands out from the mass gathering as the people who contract it interact with others, potentially at other mass gatherings. Zucker Decl. ¶ 69.

Since early September 2020, DOH has observed clusters spike in a number of areas, including one large area in Brooklyn, two smaller areas in Queens, Broome County, Orange County, and in Rockland County. *Id.* ¶ 81. In the 20 zip codes that Governor Cuomo deemed most problematic, the positivity rate was 5.5 percent on Tuesday, far exceeding the 1.2 percent rate for the rest of the State.[6] "Over the last week, the statewide rate of infection has regularly topped one percent—it was 1.45 percent in tests reported to the state on Monday—reflective of much higher rates of infection in hot spots."[7]

Responding to this new surge, on October 6, 2020, in a public briefing, Governor Cuomo announced "a new cluster action initiative" ("cluster initiative") to address COVID-19 hot spots that have cropped up.[8] The cluster initiative is composed of three steps: (1) take dramatic action within the cluster; (2) take action in the area surrounding the cluster to stop the spread; and (3) take precautionary action in the outlying communities. Zucker Decl. ¶ 92. The clusters were developed from data showing where COVID-19 positive cases are occurring.[9]

EO 202.68 directs DOH to determine "areas in the State that required enhanced public health restrictions based upon cluster-based cases of COVID-19 at a level that compromises the State's containment of the virus." EO 202.68. The Order addresses these hot spots by creating three zones "[b]ased upon the severity of the cluster activity." The "red zones" have experienced the sharpest in increase in COVID-19 cases, The rate of positive tests in the red zone in New York City is approximately 8%, whereas the rest of the City hovers at around 1%. Zucker Decl. ¶ 81.

The most severe mitigation measures are in the "red zones," with gradually fewer

---

[6] https://www.nytimes.com/2020/10/06/nyregion/cuomo-shutdown-coronavirus.html.
[7] https://www.nytimes.com/2020/10/06/nyregion/cuomo-shutdown-coronavirus.html.
[8] https://www.governor.ny.gov/news/governor-cuomo-announces-new-cluster-action-initiative#initiativemaps
[9] *See* https://www.governor.ny.gov/news/governor-cuomo-announces-new-cluster-action-initiative/

restrictions in "orange" and "yellow" zones as one moves further from the epicenter. *Id.* ¶ 83.

Specifically, in the red zones, DOH shall adopt mitigation measures that, in essence, postpone all non-essential gatherings and close schools and non-essential businesses to the extent they operate in person:

- "Non-essential gatherings of any size shall be postponed or cancelled";
- "All non-essential businesses, as determined by the Empire State Development Corporation based upon published guidance, shall reduce in-person workforce by 100%";
- "[A]ny restaurant or tavern shall cease serving patrons food or beverages on-premises and may be open for takeout or delivery only"; and
- "[T]he local Department of Health shall direct closure of all schools for in-person instruction, except as otherwise provided in Executive Order."

However, unlike these schools, businesses, restaurants and bars, houses of worship in the red zone need only reduce capacity: "houses of worship shall be subject to a capacity limit of 25% of maximum occupancy or 10 people, whichever is fewer." *Id.*

In moderate severity warning areas, or "orange zones," DOH shall adopt mitigation measures that includes the "closure of all schools for in-person instruction" as well as the following other mitigation measures:

- "Non-essential gathering shall be limited to 10 people";
- [C]ertain non-essential businesses, for which there is a higher risk associated with the transmission of the COVID-19 virus, including gyms, fitness centers or classes, barbers, hair salons, spas, tattoo or piercing parlors, nail technicians and nail salons, cosmetologists, estheticians, the provision of laser hair removal and electrolysis, and other personal care services shall reduce in-person workforce by 100%"; and
- "[A]ny restaurant or tavern shall cease serving patrons food or beverages inside on-premises but may provide outdoor services, and may be open for takeout or delivery, provided however, any one seated group or party shall not exceed 4 people."

However, unlike schools and personal care businesses, houses of worship in orange zones may remain open and are not limited to 10 people: "houses of worship shall be subject to a maximum capacity limit of the lesser of 33% of maximum occupancy or *25 people*, whichever is fewer." *Id.* (emphasis added).

7

In precautionary or "yellow zones," DOH has to adopt the following mitigation

measures:

- "Non-essential gatherings shall be limited to no more than 25 people";
- "[A]ny restaurant or tavern must limit any one seated group or party size to 4 people"; and
- "[T]he Department of Health shall issue guidance by October 9, 2020 regarding mandatory testing of students and school personnel, and schools shall adhere to such guidance."

However, in yellow zones, houses of worship are not necessarily limited to 25 people, but

instead are "subject to a capacity limit of 50% of its maximum occupancy and shall adhere to

[DOH] guidance."

As Governor Cuomo explained at the October 8, 2020 press conference discussing the

new cluster action initiative, "working with the top public health experts, New York State

developed a science-based approach to attack these clusters and stop any further spread of the

virus, including new rules and restrictions directly targeted to areas with the highest

concentration of COVID cases and the surrounding communities."[10]

The key purpose of EO 202.68 is to tackle the risk posed by mass gatherings, including

those taking place in houses of worship. Explaining the rationale behind EO 202.68, Governor

Cuomo said: "A mass gathering causes infections, infections cause a cluster, a cluster causes

community spread." Schick Decl. Ex. F at 3. Stated another way, the EO effectively mitigates the

risk of infection and reduces transmission by reducing density in places where people gather,

including houses of worship. Zucker Decl. ¶ 66, 88.

**THE PRESENT LAWSUIT AND MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Plaintiffs, which include an Orthodox Jewish organization, synagogues, and rabbis, allege

---

[10] *See* https://www.governor.ny.gov/news/governor-cuomo-announces-new-cluster-action-initiative

that EO 202.68 violates their constitutional rights by limiting attendance at houses of worship that fall within "red," "orange," and "yellow" zones, particularly as Orthodox Jewish congregants get ready to celebrate three upcoming Jewish Holidays on October 9, 10, and 11. Compl. ¶¶ 74, 76, 97. Plaintiffs commenced this action by filing a complaint on or about October 8, 2020. ECF No. 1 ("Complaint" or "Compl."). The Complaint alleges only one count: that EO 202.68 violates the Free Exercise Clause. First, Plaintiffs argue that EO 202.68 is facially discriminatory as the restrictions in each zone expressly impose gathering restrictions on "houses of worship." Compl. ¶¶ 98-99. Second, Plaintiffs argue that EO 202.68 infringes on the religious practices of the Orthodox Jewish community, and "Defendants actions and contemporaneous statements establish this lack of neutrality." Compl. ¶ 103.

Plaintiffs filed their motion for a temporary restraining order and preliminary injunction on October 8, 2020, requesting that the Court enjoin Governor Cuomo from enforcing EO 202.68 to restrict the gathering in Plaintiffs' houses of worship effective on or about October 9, 2020, which is the date on which the first of three successive Jewish holidays begin. ECF No. 2, Memorandum of Law in Support of Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction ("Pl Br.").

### STANDARD OF REVIEW

The standard for determining whether to grant a motion for a temporary restraining order is identical to the standard for a preliminary injunction, *Local 1814, Int'l Longshoreman's Ass'n, AFL-CIO v. N.Y. Shipping Ass'n*, 965 F.2d 1224, 1228 (2d Cir. 1992), which is "an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 24 (2008). Plaintiff bears the burden of establishing (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest. *Winter*, 555 U.S. at

9

20. The final two factors – the balance of the equities and the public interest, "merge when the Government is the opposing party." *L&M Bus Corp. v. Bd. of Educ.*, 2018 WL 2390125, at \*13 (E.D.N.Y. May 25, 2018) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

## ARGUMENT

## I.     PLAINTIFF CANNOT ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS

### A.     The Executive Order Should Be Upheld Under The *Jacobson* Standard

This is the latest in a series of actions brought in New York and across the country that have challenged state and local government restrictions on in-person gatherings enacted to reduce the death toll from COVID-19. Such actions contradict a long line of precedent, dating back to *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), in which the Supreme Court declared that "a community has the right to protect itself against an epidemic of disease which threatens its members," and that in such times judicial scrutiny is reserved for a measure that "has no real or substantial relation to" the object of protecting the public or is "beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *Id.* at 27, 31; *see also Geller v. Cuomo*, 2020 WL 4463207, at \*10 (S.D.N.Y. Aug. 3, 2020) (relying on *Jacobson* to uphold ban of non-essential gatherings of over 50 people); *Phillips v. City of N.Y.*, 775 F.3d 538, 543 (2d Cir. 2015) ("'The right to practice religion freely does not include liberty to expose the community . . . to communicable disease.") (quoting *Prince v. Mass.*, 321 U.S. 158 (1943)).

The most recent Supreme Court decision in the *Jacobson* line is *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020) (Roberts, C.J., concurring), which is dispositive here. The plaintiffs in *South Bay* challenged an Executive Order issued by the Governor of California that limits "attendance at places of worship to 25% of building capacity or a maximum of 100 attendees." *Id.* at \*1. Concurring with the Court's denial of plaintiffs'

application for preliminary injunctive relief, Chief Justice Roberts stated as follows:

> The precise question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement. Our Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect.' When those officials "undertake[] to act in areas fraught with medical and scientific uncertainties," their latitude "must be especially broad.

*Id.* at *2-*3 (denying injunctive relief against order aimed at limiting spread of COVID-19); *see also Ass'n of Jewish Camp Operators v. Cuomo*, 2020 WL 3766496, at *8 (N.D.N.Y. July 6, 2020) (joining "the many courts throughout the country that rely on *Jacobson* when determining if a governor's executive order has improperly curtailed an individual's constitutional right during the COVID-19 pandemic"); *Luke's Catering Service, LLC v. Cuomo*, 2020 WL 5425008, at *14-15 (W.D.N.Y. Sept. 10, 2020) (applying *Jacobson* to deny preliminary injunction and grant cross-motion to dismiss, in a challenge to New York's 50-person limit on event venues).[11]

---

[11] This principle of deference to states' determinations as to how to protect their citizens from the COVID-19 pandemic has resulted in a chorus of decisions upholding state laws and directives. *See, e.g.*, *League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*, 814 F. App'x 125 (6th Cir. 2020) (MI order closing indoor gyms); *Elim Romanian Pentecostal Church v. Pritzker*, 962 F.3d 341 (7th Cir. 2020) (IL order limiting size of religious services); *In re Abbott*, 954 F.3d 772 (5th Cir. 2020) (TX temporary ban on unnecessary procedures, including abortion); *Corbett v. Cuomo*, 20 Civ. 4864, Dkt. No. 13 (S.D.N.Y. July 2, 2020) (NY order requiring travel quarantine); *Ill. Republican Party v. Pritzker*, 2020 WL 3604106 (N.D. Ill. July 2, 2020) (IL gatherings restriction); *Elmsford Apt. Associates, LLC v. Cuomo*, 2020 WL 3498456 (S.D.N.Y. June 29, 2020) (NY eviction moratorium); *McCarthy v. Cuomo*, 2020 WL 3286530 (E.D.N.Y. June 18, 2020) (NY gathering restriction); *Slidewaters LLC v. Wash. Dep't of Labor & Indus.*, 2020 WL 3130295 (E.D. Wash. June 12, 2020) (WA order closing certain business); *Calvary Chapel Lone Mtn. v. Sisolak*, 2020 WL 3108716 (D. Nev. June 11, 2020) (NV order limiting size of religious services); *Prof'l Beauty Fed. of Cal. v. Newsom*, 2020 WL 3056126 (C.D. Cal. June 8, 2020) (CA order closing non-essential business); *Talleywhacker, Inc. v. Cooper*, 2020 WL 3051207 (E.D.N.C. June 8, 2020) (NC order closing non-essential business); *Best Supplement Guide, LLC v. Newsom*, 2020 WL 2615022 (E.D. Cal. May 22, 2020) (CA order closing non-essential business); *Antietam Battlefield KOA v. Hogan*, 2020 WL 2556496 (D. Md. May 20, 2020) (MD gathering restriction); *Open Our Oregon v. Brown*, 2020 WL 2542861 (D. Or. May 19, 2020) (OR order closing non-essential business); *Geller v. De Blasio*, 2020 WL 2520711 (S.D.N.Y. May 18, 2020) (NY gathering restriction); *Henry v. DeSantis*, 2020 WL 2479447 (S.D. Fla. May 14, 2020) (FL order closing businesses and restricting movement); *Calvary Chapel of Bangor v. Mills*, 2020 WL 2310913 (D. Me. May 9, 2020) (ME gatherings restriction); *McGhee v. City of Flagstaff*, 2020 WL 2308479 (D. Az. May 8, 2020) (AZ stay-at-home order and order closing business); *Cross Culture Christian Ctr. v. Newsom*, 445 F. Supp. 3d 758 (E.D. Cal. 2020) (CA gathering restriction); *Cassell v. Snyders*, 2020 WL 2112374 (N.D. Ill. May 3, 2020) (IL stay-at-home order); *Lighthouse Fellowship Church v. Northam*, 2020 WL 2110416 (E.D. Va. May 1, 2020) (VA gathering restriction); *Gish v. Newsom*, 2020 WL 1979970 (C.D. Cal. Apr. 23, 2020) (CA stay-at-home order); *Legacy Church, Inc. v. Kunkel*, 2020 WL 1905586 (D.N.M. Apr. 17, 2020) (NM gathering restriction).

The Supreme Court's decisions in *Jacobson* and *South Bay* are dispositive here. New York has right to protect itself from a deadly, world-wide pandemic that has already claimed the lives of over 210,000 Americans, including over 16,000 New York City residents. The Governor's decision to close or restrict businesses and to postpone or limit gatherings in certain areas based on a sharp spike in COVID-19 cases in those areas is eminently reasonable. The Executive Order has a real and substantial relation to protecting the public under *Jacobson* because it seeks to contain further spread of this highly infectious disease where authorities have found that cluster-based cases threaten the State's containment of the virus.

Plaintiffs' attempts to distinguish *Jacobson* and *South Bay* are unavailing. Plaintiffs erroneously claim that EO 202.68 "imposes limits on houses of worship while simultaneously allowing gatherings of more individuals for comparable secular activity and businesses." Pl. Br. at 19. But in actuality, EO 202.68 *accommodates* religious activity over secular activity. Indeed, in the red zone, non-essential gatherings are banned entirely, non-essential business are 100% closed, restaurants are closed for indoor and outdoor dining, and schools are entirely closed.[12] Houses of worship, on the other hand, are only subject to a limit of 25% occupancy or 10 people, whichever is fewer. Similarly, in the orange zones, non-essential gatherings are limited to 10 people, schools and high risk businesses are entirely closed, and restaurants are closed for indoor dining. Houses of worship, on the other hand, are only subject to a limit of 33% occupancy or 25 people, whichever is fewer. Finally, in yellow zones, non-essential gatherings are limited to 25 people, restaurants cannot seat parties of more than four for indoor dining, and indoor dining is

---

[12] Plaintiffs mistakenly claim that non-essential business are "undefined." Pl. Br. at 16. Executive Order 202.6, issued in March, listed what businesses and services in New York State were deemed "essential" and the Empire State Development Corporation ("ESD"), a New York State public benefit corporation, also issued guidance in March to further clarify which businesses would be considered "essential" or "non-essential." *See* Executive Order 202.6, available at https://www.governor.ny.gov/news/no-2026-continuing-temporary-suspension-and-modification-laws-relating-disaster-emergency; ESD guidance, available at https://esd.ny.gov/guidance-executive-order-2026.

already restricted to 25% capacity in New York City. Houses of worship, on the other hand, are only subject to a 50% occupancy limit.

In addition, as discussed in further detail below, any industries that are permitted to be open at full capacity in the yellow or orange zones are quite different from houses of worship, and thus are not appropriate comparators. *See S. Bay*, 140 S. Ct. 1613 (finding that operating grocery stores, banks, and laundromats was dissimilar to worship services); *Elim Romanian Pentecostal Church*, 962 F.3d at 347 (finding church service unlike grocery stores, pharmacies, and warehouses, and more like concerts and movie theaters).

To the extent Plaintiffs attempt to imply that the *Jacobson* standard does not apply to claims concerning the Free Exercise Clause, they are incorrect. *South Bay* dealt with a free exercise claim, and Chief Justice Roberts nonetheless applied *Jacobson*. The Seventh Circuit in *Elim Romanian Pentecostal Church*, 962 F.3d at 347, also recently applied *Jacobson* to a Free Exercise claim and cited to *Jacobson* to uphold an order that restricted religious gatherings to ten people. In that case, the court also relied on *Jacobson* to reject the plaintiff's argument that the court should overturn the order because warehouses were allegedly more dangerous than religious services or because it was arbitrary for the state not to "differentiate between the maximum gathering permitted in a small church and a cathedral with seats for 3,000." *Id.*

Similarly, the district court in *Association of Jewish Camp Operators*, 2020 WL 3766496, at *8, relied on *Jacobson* to reject a Free Exercise challenge to an Executive Order prohibiting overnight camps. The plaintiffs in that case, similar to Plaintiffs here, argued that the Second Circuit found in *Phillips*, 775 F.3d 538, that *Jacobson* does not apply to the Free Exercise Clause. *See* Pl. Br. at 19; *Ass'n of Jewish Camp Operators*, 2020 WL 3766496, at *8. The court disagreed, finding that "[c]ontrary to Plaintiffs' position, the Second Circuit explicitly

stated that it followed the reasoning of *Jacobson* when concluding that a mandatory vaccination policy, as a condition for admission to school, did not violate the Free Exercise Clause. *Ass'n of Jewish Camp Operators*, 2020 WL 3766496, at *8 (discussing *Phillips*, 775 F.3d 538).

Because *Jacobson* applies to Plaintiffs' claims, and such claims cannot survive muster thereunder, Plaintiffs have no chance of success on the merits. The preliminary injunction can be denied on this basis alone.

### B.     The Executive Order Does Not Violate The First Amendment

#### 1.   *The Executive Order Is Facially Neutral And Does Not Prevent Plaintiffs' Free Exercise Of Religion*

Even if the deferential *Jacobson* standard did not apply, Plaintiffs' claim still cannot succeed under standard First Amendment analysis. To "state a free exercise claim, a plaintiff generally must establish that 'the object of [the challenged] law is to infringe upon or restrict practices because of [its] religious motivation,' or that the law's 'purpose . . . is the suppression of religion or religious conduct.'" *Congregation of Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 915 F. Supp. 2d 574, 619 (S.D.N.Y. 2013) (quoting *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 533 (1993)). The right of the free exercise does not relieve an individual or entity of the obligation to comply with a "valid and neutral law of general applicability." *Employment Div., Dept. of Human Res. of Ore. v. Smith*, 494 U.S. 872 (1990). As a result, where a limitation on the exercise of religion is not the object, "but merely the incidental effect of a generally applicable and otherwise valid provision, the First Amendment has not been offended." *Id.* at 878. Therefore, a law that only incidentally imposes a burden on the exercise of religion need only be supported by a rational basis. *WTC Families for a Proper Burial, Inc. v. City of N.Y.*, 567 F. Supp. 2d 529, 539-40 (S.D.N.Y. 2008); *Fortress Bible Church v. Feiner*, 694 F.3d 208, 220 (2d Cir. 2012).

Here, counter to Plaintiffs' claims, the Executive Order is neutral and generally applicable. Indeed, the Executive Order applies to all non-essential industries, activities, and gatherings, as it restricts or closes schools, public gatherings of any kind, and non-essential businesses. Plaintiffs argue that "a law is 'not neutral' where 'the religious ritual it regulates is the *only* conduct subject to the' restriction by that restriction's text." Pl. Br. at 13 (quoting *Cent. Rabbinical Congress of the U.S. & Can. v. N.Y.C. Dep't of Health & Mental Hygiene*, 763 F.3d 183, 195 (2d Cir. 2014)) (emphasis added). Plaintiffs' religious practice is certainly not the only conduct subject to restriction by the Executive Order, which Plaintiffs acknowledge.

The fact that there are restrictions specific to houses of worship does not mean that the Executive Order is not generally applicable. Indeed, the Nevada District Court denied a motion for a preliminary injunction against a similar Executive Directive that covered many industries, activities, and gatherings, but had a specific rule limiting houses of worship to 50% capacity. *Calvary Chapel Dayton Valley v. Sisolak*, 2020 WL 4260438, at *1 (D. Nev. June 11, 2020). The plaintiff argued that this rule targeted religion and had lesser restrictions on comparable secular activity. *Id.* The court found that there were both "some secular activities comparable to in-person church services that are subject to more *lenient* restrictions" and others "subject to more *stringent* restrictions." *Id.* (emphasis in original). As a result, the directive was not "an implicit or explicit attempt to specifically target places of worship" and was instead "neutral and generally applicable." *Id.* Thus, the court rejected plaintiff's facial Free Exercise challenge." *Id.*[13]

Similarly here, the Executive Order applies to all non-essential activities and thus does not specifically target places of worship. Accordingly, it need only be supported by a rational basis.

---

[13] Both the Supreme Court and the Ninth Circuit subsequently denied plaintiffs' requested injunctive relief. *Calvary Chapel Dayton Vall. v. Sisolak*, 140 S. Ct. 2603 (2020); *Calvary Chapel Dayton Valley v. Sisolak*, 2020 WL 4274901, at *1 (9th Cir. July 2, 2020) (citing *S. Bay*, 140 S.Ct. 1613). Plaintiffs only cite the *dissent* in the Supreme Court's decision in *Calvary*. Pl. Br. at 19 (quoting *Calvary*, 140 S. Ct. at 2608 (Alito, J., dissenting)).

*Ass'n of Jewish Camp Operators*, 2020 WL 3766496, at \*10 ("The Supreme Court has established 'the general proposition that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice.'") (quoting *Church of Lukumi Babalu Aye, Inc.*, 508 U.S. at 531). The rational basis for the Executive Order is, of course, the State's continuing exercise of its police power to mitigate the ongoing public health crisis of COVID-19.

There are undeniable increases in COVID-19 cases in and around the neighborhoods that are subject to the Executive Order, and the rates of new cases and the positivity rates in these neighborhoods is significantly higher than in the rest of New York City. Guidance from all public health organizations is clear that social distancing is the best tool to prevent or reduce the spread of COVID-19. The Executive Order seeks to temporarily implement renewed restrictions on gatherings in these neighborhoods to end these spikes before they get worse within these neighborhoods and to prevent this renewed outbreak from spreading further outward. *See id.* at \*16 ("[P]reventing the spread of COVID-19 is a legitimate interest, and that interest is rationally related to the prohibition on overnight camps."); *McCarthy*, 2020 WL 3286530, at \*6 ("Given the seriousness of the COVID-19 pandemic, I find it exceedingly unlikely that plaintiffs will be able to demonstrate that the COVID-19 Executive Orders do not have a rational basis.").

2. *The Executive Order Does Not Discriminate Against Religious Practice Because It Does Not Permit "Comparable" Secular Conduct*

Plaintiffs incorrectly claim that the Executive Order "impermissibly discriminate against religious practice while simultaneously permitting comparable secular conduct." Pl. Br. at 12. To the contrary, the Executive Order does not permit comparable secular conduct, because as explained above, it restricts religious practice *less than* secular conduct. *See* Section I.A., *supra.*

Plaintiffs nonetheless contend that EO 202.68 improperly permits schools, universities,

16

and restaurants for indoor and outdoor dining to remain open, while religious gatherings are limited to 50% capacity. Plaintiffs ignore the significant other restrictions placed on these activities, however. Indoor dining is currently limited to 25% capacity, and must end at midnight. Further, parties are limited to groups of ten people, and there are various other safety precautions aimed at preventing parties from mingling. There are also extensive safety precautions in schools, and a significant number of students are engaged in full or partial remote learning.

Moreover, Plaintiffs' comparison of religious services to dining is misplaced. Dining is unlike a religious service because in the case of ordinary restaurant service, the customers arrive and leave at different times, and individuals do not gather and mingle together with groups outside their party. With religious gatherings, on the other hand, individuals arrive at the same time, intermingle amongst each other, engage in prayer together as well singing, chanting, and dancing together, and generally leave at the same time. The State has been consistent with its restrictions of comparable events in which people arrive simultaneously, intermingle amongst each other, watch or engage in some event together, and leave at the same time. For example, currently all music and performance venues are required to remain closed throughout the entire State due to the risks posed by individuals arriving at the same time, intermingling during the event, and leaving en masse. Large events, such as weddings, are subject to certain numerical restrictions for the same reason. Theaters also remain closed.

For the same reasons, Plaintiffs are incorrect that offices, malls, and retail stores are comparable to religious services. In orange zones, such industries are permitted to open at 50% capacity, while religious services are restricted to 25% capacity. But again, malls and retail stores do not involve individuals arriving and departing at the same time and intermingling while jointly participating in the same event. Further, social distancing is possible within offices, but

social distancing is less possible when individuals participate in joint prayer, singing, chanting, and dancing. Further, the risk of spread of COVID-19 is higher if people are raising their voices in some way, such as when singing or chanting. *See* Zucker Decl. ¶ 66.

Indeed, other courts have agreed that religious gatherings are more comparable to "functions that occur in auditoriums, such as concerts and movies," *Elim Romanian Pentecostal Church*, 962 F.3d at 346, than to shopping or work spaces. As explained by the Seventh Circuit, concerts, movies, and religious gatherings place "members of multiple families close to one another for extended periods, while invisible droplets containing the virus may linger in the air. Functions that include speaking and singing by the audience increase the chance that persons with COVID-19 may transmit the virus through the droplets that speech or song inevitably produce." *Id.* The court also rejected the plaintiff's counterargument that people remain together for extended periods in warehouses and offices, noting that "most offices contain spaces that provide social distancing" and that warehouse workers were unlikely to "engage in the sort of speech or singing that elevates the risk of transmitting the virus." *Id.* at 347. Further, Chief Justice Roberts also observed that concerts and church services are comparable to each other, but different from stores "in which people neither congregate in large groups nor remain in close proximity for extended periods." *See S. Bay*, 140 S. Ct. at 1613 (Roberts, C.J., concurring).[14]

Because Plaintiffs cannot establish a comparable activity that is less restricted within the relevant zones, any infringement on Plaintiffs' free exercise of their religion is therefore incidental. "Courts have upheld more extreme measures taken in response to public health needs, including quarantines, which limit a person's right to assemble with any other person." *Amato v.*

---

[14] The holding in the preliminary injunction decision in *Soos v. Cuomo*, 2020 WL 3488742 (N.D.N.Y. June 26, 2020), cited by Plaintiffs, is therefore not applicable. In *Soos*, the plaintiffs showed that greater restrictions were being placed on gatherings for religious observances than on other types of comparable gatherings. *Id.* at *12. Plaintiffs have failed to show that here.

*Elicker*, 2020 WL 2542788, at *11 (D. Conn. May 19, 2020) (citing, *inter alia*, *Compagnie Francaise de Navigation a Vapeur v. La. Bd. of Health*, 186 U.S. 380 (1902)).

### 3. The Executive Order Does Not Target Conduct Because Of Its Religious Motivation, Nor Does It Target The Orthodox Jewish Community

Plaintiffs flatly err in claiming that Governor Cuomo has singled out the Orthodox Jewish community for discriminatory treatment. *See* Pl. Br. at 17-18. To the extent Governor Cuomo stated to "religious institutions" and "members of the ultra-Orthodox community" that "[i]f you do not agree to enforce the rules, then we'll close the [religious] institutions down" (Pl. Br. at 17), that was simply to explain that houses of worship would *not* be exempt from this generally applicable Executive Order. Governor Cuomo did not single out this community for negative treatment, but clarified that this community would not receive special treatment. Such statement is entirely consistent with the Constitution and the First Amendment. *Employment Div., Dept. of Human Resources of Ore.*, 494 U.S. 872 (right of the free exercise does not relieve an individual or entity of the obligation to comply with a "valid and neutral law of general applicability").

Nor was it discriminatory to acknowledge the fact that religious gatherings are mass gatherings that raise the potential of spread of COVID-19. Pl. Br. at 17. At this stage in the pandemic, it is no longer subject to dispute that mass gatherings can act as super-spreading events. Zucker Decl. ¶¶ 63-72. And a mass gathering is not less dangerous simply because it is religious in nature. Moreover, "'[t]he right to practice religion freely does not include liberty to expose the community . . . to communicable disease.'" *Phillips*, 775 F.3d at 543 (quoting *Prince*, 321 U.S. at 166-67).[15]

---

[15] Further, the myriad of organizations that object to EO 202.68 shows that it does not only affect the Orthodox Jewish community uniquely. Indeed, a Catholic church, a law firm, and a car dealership have all initiated suits. *Roman Catholic Diocese of Brooklyn, New York v. Cuomo*, No. 20-cv-4844 (E.D.N.Y.); *Plaza Motors of Brooklyn, Inc. v.* Cuomo, No. 20-4851 (E.D.N.Y.) (car dealership); and *Turturro Law, P.C. v. Cuomo*, No. 20-cv-4824 (E.D.N.Y. (law firm).

>    4.  *Even If Strict Scrutiny Applies – Which It Does Not – Plaintiffs' Claims Would*
>        *Still Fail*

Strict scrutiny requires the State to show that the order "advance[s] interests of the

highest order" and that it is "narrowly tailored in pursuit of those interests." *Church of Lukumi*

*Babalu Aye, Inc.*, 508 U.S. at 546. The fight against COVID-19 is indeed a governmental interest

of the highest order; "it bears repeating what is at stake . . . the [State] seeks to slow the spread of

a virus that has hospitalized and killed tens of thousands of New Yorkers and infected hundreds

of thousands more – in less than three months' time." *Geller*, 2020 WL 2520711, at \*4. It is

essential that New York City never get close to repeating the fast spread of COVID-19 and the

resulting severe illnesses and deaths that occurred earlier this year. The Executive Order at issue

here is narrowly tailored to that interest.

Although federal courts have repeatedly refused to apply the strict scrutiny standard to

COVID-related executive orders, they have also repeatedly stated in dicta that these critical

public health provisions would meet either standard. *See, e.g.*, *Legacy Church, Inc.*, 2020 WL

1905586, at \*38 ("The [New Mexico] Order is reasonably related to the demands of the public

health crisis, coronavirus. Moreover, if the [] Order was subject to a strict scrutiny analysis, the

Court would conclude that it meets strict scrutiny."); *Calvary Chapel of Bangor*, 2020 WL

2310913, at \*9 n.17 ("Even if the [Maine] orders were subject to heightened scrutiny, the

Governor would likely be able to show that they serve a compelling government interest

(preventing the spread of COVID-19) and that they are narrowly tailored.").

The same result follows for the Executive Order at issue here, particularly given the

unprecedented ferocity of the disease in New York City and the extraordinary tailoring efforts

the State has made. Indeed, prior Executive Orders applied city-wide or statewide. This

Executive Order is so narrowly tailored that Governor Cuomo has declined to target areas by zip

20

code because that was not specific enough. Further, the Executive Order sets out rules for three different zones, to ensure that restrictions were not unnecessarily harsh on the zones outside the primary hotspots. In addition, most of the City is not within the zones at all: because the increases in cases are specific to certain neighborhoods, so is the Executive Order.

Further, the restrictions on religious gatherings are narrowly tailored because there are again three different zones and religious gatherings are only subject to the strictest limits within the primary hotspots. In addition, these restrictions are necessary within these neighborhoods and communities, *because that is where the spikes in cases are happening*. The First Amendment's protections do not require that the government ignore reality and common sense. The data is clear that these outbreaks are happening in these specific neighborhoods, and the government is acting on this data. To be clear, reacting quickly and decisively to prevent these spikes from getting out of control is certainly an "interest of the highest order," and an Executive Order focusing on the neighborhoods with the spikes is narrowly tailored to that interest.

Plaintiffs also assert that prior, less severe restrictions were not enforced and thus it is irrational that the new, more severe restriction will be enforced. But there is nothing irrational about the State changing tactics based on changing circumstances. *See S. Bay*, 140 S. Ct. at 1614 (Roberts, C.J., concurring) (measures to prevent spread "should not be subject to second-guessing" especially where "a party seeks emergency relief in an interlocutory posture, while local officials are actively shaping their response to changing facts on the ground"). Also, it is clear that the prior rules and enforcement were insufficient to prevent the spikes in cases in these neighborhoods. Moreover, enforcement is largely at the local level, and to the extent the prior restrictions may have been under-enforced, it was not due to any action or inaction by the State.

Plaintiffs also complain that the Executive Order is targeting neighborhoods based on an

21

increase in positive tests, but argues that hospitalizations and deaths would be the better indicator

of an actual increase in COVID-19 cases. However, it is common knowledge at this point that

hospitalizations and deaths are lagging indicators for increases in COVID-19 cases. The State

must be able to act as quickly as possible where there are spikes in infection cases in order to

protect the public health. Here, there is clear evidence of spikes in the relevant neighborhoods.

Finally, Plaintiffs complain about Governor Cuomo's threats that religious gatherings

will be shut down if they do not comply with the Executive Order. However, there is no basis for

Plaintiffs to complain about a threatened enforcement, because it assumes that the relevant

synagogues will refuse to comply with the Executive Order. The Court should not make such an

assumption, and thus this claim regarding potential enforcement is not yet ripe. *United States v.

Fell*, 360 F.3d 135, 140 (2d Cir. 2004) (The ripeness requirement "prevent[s] a federal court

from entangling itself in abstract disagreements over matters that are premature for review

because the injury is merely speculative and may never occur.").

## II.   THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH IN FAVOR OF NEW YORK'S MISSION TO PROTECT ITS CITIZENS FROM A GLOBAL PANDEMIC

The balance of equities and considerations of the public interest decidedly weigh in favor

of denying Plaintiffs' request for emergency relief. "As the Supreme Court reaffirmed in

*Winter*[, 555 U.S. 7], a plaintiff seeking a preliminary injunction must demonstrate not just that

they have some likelihood of success on the merits and will suffer irreparable harm absent an

injunction, but also that the 'balance of the equities tips in his favor and an injunction is in the

public interest.'" *Otoe-Missouria Tribe v. N.Y.S. Dep't of Fin. Svcs.*, 769 F.3d 105, 112 n.4. (2d

Cir. 2014). "These factors merge when the Government is the opposing party." *Make the Rd.

N.Y. v. Cuccinelli*, 419 F. Supp. 3d 647, 665 (S.D.N.Y. 2019) (citing *Nken*, 556 U.S. at 435).

Further, the court must ensure that the "public interest would not be disserved" by the

issuance of a preliminary injunction. *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010). In exercising their discretion in whether to enter an injunction, courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *N.Y.S. Rifle & Pistol Ass'n v. City of N.Y.*, 86 F. Supp. 3d 249, 258 (S.D.N.Y. 2015), *aff'd*, 883 F.3d 45 (2d Cir. 2018) (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). This consideration includes the government's interest in public health. *Million Youth March, Inc. v. Safir*, 155 F.3d 124, 125-26 (2d Cir. 1998) (modifying injunction because District Court failed to consider government's interest in, *inter alia*, public health against First Amendment rights).

The government's interest in preventing spikes in COVID-19 cases from increasing in severity is vitally important. Restricting all public gatherings, including religious gatherings, within neighborhoods that are seeing a spike in cases certainly furthers that interest. *See Ass'n of Jewish Camp Operators*, 2020 WL 3766496, at *21 (injunction was not in the public interest due to "the unprecedented nature of the COVID-19 pandemic, the deadly nature of the virus itself, the lack of a vaccine at the time of this writing, and lack of scientific agreement about its transmission"). Plaintiffs' interest in having indoor, in-person religious gatherings of as many people as they wish, at a time when cases are spiking in and around their neighborhoods, cannot outweigh the critical need to ensure that the infection spikes do not rapidly increase and spread further. New York City saw firsthand how quickly the spread of COVID-19 can spiral out of control, and New York City saw firsthand how the result was an overwhelmed hospital system and a dramatic increase in severe illnesses and deaths. It is vital that the government be able to do everything possible to stop any case increases.

Plaintiffs' claim that they will adhere to "rigorous health and safety protocols" is insufficient to ensure that the State can get the spike in COVID-19 cases under control. Pl. Br. at

21. As explained above, religious services have specific risk factors, including that individuals arrive at the same time, intermingle amongst each other, engage in prayer, singing, chanting, and dancing together, and then leave at the same time. Plaintiffs concede as much. Pl. Br. at 9-10 (services will involve recitation of prayers sure to cause emotional reactions and each congregant giving a reading). Then there are further risks, given that individuals must remove their masks in order to eat at religious celebrations.

Also, Plaintiffs' claim that they have adhered to "rigorous health and safety protocols" and that their continued adherence to "rigorous health and safety protocols" should itself be sufficient to prevent a spike in cases is clearly mistaken, *as there is currently a spike of COVID-19 cases in their neighborhoods*. The current restrictions, guidelines, and enforcement levels plainly are not working in some areas. Thus, further restrictions and enforcement are necessary.

Accordingly, the public interest and equitable considerations require the denial of Plaintiffs' motion. *See Winter*, 55 U.S. at 23-24 (holding "proper consideration" of public interest and equitable factor "alone require[d] denial of the requested injunctive relief").

## III.   PLAINTIFF HAS NOT SHOWN A LIKELIHOOD OF IRREPARABLE HARM

Plaintiffs failed to present sufficient evidence that the temporary measures implemented to combat the COVID-19 pandemic will cause it irreparable harm. *Vis Vires Grp., Inc. v. Endonovo Therapeutics, Inc.*, 149 F. Supp. 3d 376, 390 (E.D.N.Y. 2016) ("To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm.") (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)). EO 202.68 still permits religious gatherings. Indeed, as described above, religious gatherings have maximum occupancy limits *higher than* other public gatherings. In addition, even the most restrictive limit

24

in the red zones permits religious gatherings of up to ten people, which is the minimum requirement of a *minyan*,  the quorum required for traditional Jewish public worship.

On the other hand, the State suffers irreparable harm any time that it is enjoined by the court from enforcing one of its policies. *Maryland v. King*, 567 U.S. 1301, 1301 (2012) (Roberts, C.J., in chambers). In the present case, such harm is manifest because the policy Plaintiffs challenge is intended to halt neighborhood spikes in COVID-19 cases and prevent deadly infections from increasing exponentially and spreading more widely. Enjoining the Executive Order would impair the State's critical ability to rapidly address the developing hotspots, and would thereby endanger the public health.

## CONCLUSION

For the reasons set forth above, Governor Cuomo respectfully requests that the Court deny Plaintiffs' motion for a temporary restraining order and preliminary injunction and grant such other and further relief as the Court deems just and proper.

Dated: New York, New York
      October 9, 2020

LETITIA JAMES
Attorney General of the State of New York
***Attorney for Governor Cuomo***

By: _____ /s/  Todd A. Spiegelman_____
Todd A. Spiegelman
Erin R. McAlister
Maryam Jazini Dorcheh
Assistant Attorneys General
28 Liberty Street, New York, NY 10005
(212) 416-8661