Park, *Circuit Judge*, dissenting:

In response to the COVID-19 pandemic, the Governor of New York issued an executive order imposing strict capacity limits on "houses of worship" in certain specified "zones." Those restrictions apply only to religious institutions; in the same zones, pet shops, liquor stores, and other businesses the Governor considers "essential" remain open, free from any capacity limits. By singling out "houses of worship" for unfavorable treatment, the executive order specifically and intentionally burdens the free exercise of religion in violation of the First Amendment. I would thus grant the motions for injunctive relief pending appeal.

I

Discrimination against religion is "odious to our Constitution." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2025 (2017). "Official action that targets religious conduct for distinctive treatment" must thus satisfy "the most rigorous of scrutiny." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534, 546 (1993).

A

First, the executive order fails the "minimum requirement of neutrality" towards religion, which means that a government policy may "not discriminate on its face." *Id*. at 533. The order authorizes the New York State Department of Health to designate "areas in the State that require enhanced public health restrictions" as red, orange, or yellow zones. N.Y. Exec. Order No. 202.68. In each zone, the order subjects only "houses of worship" to special "capacity limit[s]": in red zones, "25% of maximum occupancy or 10 people, whichever is fewer"; in orange zones, "the lesser of 33% of maximum occupancy or 25 people"; and in yellow zones, "50% of . . . maximum occupancy." *Id.* But in the very same zones, numerous businesses deemed "essential" may operate with no such restrictions.[1] This disparate treatment of religious and secular institutions is plainly not neutral.

The Governor's public statements confirm that he intended to target the free exercise of religion. The day before issuing the order, the Governor said that if the "ultra-Orthodox [Jewish] community" would not agree to enforce the rules, "then we'll close the institutions down."[2] *See Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1731 (2018) (factors relevant to the assessment of neutrality include "the specific series of events leading to the enactment or

---

[1] *See Guidance for Determining Whether a Business Enterprise Is Subject to a Workforce Reduction Under Recent Executive Orders*, N.Y. State Dep't of Econ. Dev. (updated Oct. 23, 2020), https://esd.ny.gov/guidance-executive-order-2026; *Guidance for Determining Whether a Business Enterprise Is Subject to a Workforce Reduction Under Executive Order 202.68*, N.Y. State Dep't of Econ. Dev. (updated Oct. 7, 2020), https://esd.ny.gov/ny-cluster-action-initiative-guidance; Hearing Tr. at 81–82, No. 20-cv-4844 (E.D.N.Y. Oct. 15, 2020).

[2] *Governor Cuomo Updates New Yorkers on State's Progress During COVID-19 Pandemic*, Off. of the Governor (Oct. 5, 2020), https://www.governor.ny.gov/news/video-audio-photos-rush-transcript-governor-cuomo-updates-new-yorkers-states-progress-during-1.

official policy in question" and "contemporaneous statements made by members of the decisionmaking body").

The Governor argues that the executive order should nonetheless be subject to only rational-basis review because it treats houses of worship "more favorably" than "non-essential" secular businesses, like theaters, casinos, and gyms. But this only highlights the fact that the order is not neutral towards religion. Rational-basis review applies when a generally applicable policy incidentally burdens religion, but a policy that expressly *targets* religion is subject to heightened scrutiny. *See Cent. Rabbinical Cong. of U.S. & Can. v. N.Y.C. Dep't of Health & Mental Hygiene*, 763 F.3d 183, 194 (2d Cir. 2014). Here, the executive order does not impose neutral public-health guidelines, like requiring masks and distancing or limiting capacity by space or time. Instead, the Governor has selected some businesses (such as news media, financial services, certain retail stores, and construction) for favorable treatment, calling them "essential," while imposing greater restrictions on "non-essential" activities and religious worship. Such targeting of religion is subject to strict scrutiny.

*South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020) (mem.), is not to the contrary. Summary decisions of the Supreme Court are precedential only as to "the precise issues presented and necessarily decided." *Mandel v. Bradley*, 432 U.S. 173, 176 (1977). Petitioners in *South Bay* sought a writ of injunction, which is granted only when "the legal rights at issue are indisputably clear." *Id*. at 1613 (Roberts, *C.J.*, concurring) (citation omitted). Here, Appellants seek injunctions pending appeal, for which they need to show, at most, a "'substantial' likelihood" of success on the merits. *United for Peace & Just. v. City of New York*, 323 F.3d 175, 178 (2d Cir. 2003). In addition, the motions before this Court arise from quite different circumstances. *South Bay* was decided during the early stages of the pandemic, when local governments were struggling to prevent the healthcare system from being overwhelmed and were "actively shaping their response to changing facts on the ground." 140 S. Ct. at 1614 (Roberts, *C.J.*, concurring). By contrast, the Governor's stated concern here is maintaining localized containment. In April, New York reported a seven-day average of nearly 1,000 deaths per day from COVID-19.[3] Six months later, that average has not exceeded 20 for months. *See id.*

Finally, the Governor overstates the import of *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), which upheld a mandatory vaccination law against a substantive due process challenge. *Jacobson* was decided before the First Amendment was incorporated against the states, and it "did not address the free exercise of religion." *Phillips v. City of New York*, 775 F.3d 538, 543 (2d Cir. 2015). Indeed, the Court specifically noted that "even if based on the acknowledged police powers of a state," a public health measure "must always yield in case of conflict with . . . any right which [the Constitution] gives or secures." 197 U.S. at 25. *Jacobson* does not call for indefinite

---

[3] *See New York Covid Map and Test Count*, N.Y. Times (updated Nov. 4, 2020), https://www.nytimes.com/interactive/2020/us/new-york-coronavirus-cases.html.

deference to the political branches exercising extraordinary emergency powers, nor does it counsel courts to abdicate their responsibility to review claims of constitutional violations.

B

Applying strict scrutiny, there is little doubt that the absolute capacity limits on houses of worship are not "narrowly tailored." *Lukumi*, 508 U.S. at 546. As the Governor himself admitted, the executive order is "not a policy being written by a scalpel," but rather is "a policy being cut by a hatchet." *See* Appellant's Br., No. 20-3590, at 4.

First, the fixed capacity limits do not account in any way for the sizes of houses of worship in red and orange zones. For example, two of the Diocese's churches in red or orange zones as of October 8, 2020 seat more than a thousand people. But the order nonetheless subjects them to the same 10-person limit in red zones applicable to a church that seats 40 people. Such a blunderbuss approach is plainly not the "least restrictive means" of achieving the State's public safety goal. *Lukumi*, 508 U.S. at 578.

The fixed capacity limits also bear little relation to the particular COVID-19 transmission risks the Governor identifies with houses of worship, such as "singing or chanting" and mingling before and after services. Churchgoers and daveners remain subject to generally applicable distancing and mask requirements, so the additional capacity limits assume that worshippers—unlike participants in "essential" activities—will not comply with such restrictions. The Governor may not, however, "assume the worst when people go to worship but assume the best when people go to work or go about the rest of their daily lives in permitted social settings." *Roberts v. Neace*, 958 F.3d 409, 414 (6th Cir. 2020). Here, Appellants have made clear that they would follow any generally applicable public-health restrictions.[4]

II

The remaining injunction factors also support granting the motions. Appellants presented unrebutted evidence that the executive order will prevent their congregants from freely exercising their religion. And "[t]he loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.)).[5]

---

[4] For example, the Diocese presented evidence that, even before the order, it had voluntarily restricted attendance to 25% of building capacity and required masks during Mass; it has also "agreed to accept potential further restrictions (such as eliminating congregant singing and choirs during Mass) as a condition of injunctive relief." Appellant's Br., No. 20-3590, at 4.

[5] The district court in the *Agudath Israel* case found that plaintiffs had not demonstrated irreparable harm because "the Orthodox community has previously complied with the total lockdown" and they could "continue to observe their religion" with "modifications." Tr. of Proceedings at 66, No. 20-cv-04834 (E.D.N.Y. Oct. 9, 2020). This was error, in light of which plaintiffs reasonably believed that another motion for injunction in the district court would be futile. *See, e.g.*, *Hernandez v. Comm'r*, 490 U.S. 680, 699

3

Finally, the balance of equities and public interest favor Appellants. The question is not whether the State may take generally applicable public-health measures, but whether it may impose greater restrictions only on houses of worship. It may not.

I respectfully dissent from the denial of the motions for injunctions pending appeal.

---

(1989) ("It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.").