20-3572; 20-3590
Agudath Israel of America v. Cuomo; Roman Catholic Diocese of Brooklyn v. Cuomo

# United States Court of Appeals
# for the Second Circuit

August Term, 2020

(Argued: December 18, 2020     Decided: December 28, 2020)

Docket Nos. 20-3572; 20-3590

———————————————————

AGUDATH ISRAEL OF AMERICA, AGUDATH ISRAEL OF
KEW GARDEN HILLS, AGUDATH ISRAEL OF MADISON,
AGUDATH ISRAEL OF BAYSWATER, RABBI YISROEL REISMAN,
RABBI MENACHEM FEIFER, STEVEN SAPHIRSTEIN,

*Plaintiffs-Appellants*,

v.

ANDREW M. CUOMO, GOVERNOR OF THE STATE OF NEW YORK,
IN HIS OFFICIAL CAPACITY,

*Defendant-Appellee.*

———————————————————

THE ROMAN CATHOLIC DIOCESE OF BROOKLYN, NEW YORK,

*Plaintiff-Appellant*,

v.

GOVERNOR ANDREW M. CUOMO, IN HIS OFFICIAL CAPACITY,

*Defendant-Appellee.*

———————————————————

1    Before:
2
3              LIVINGSTON, *Chief Judge*, PARK and MENASHI, *Circuit Judges*.
4
5              On October 6, 2020, in response to an increase in COVID-19 cases, Governor
6    Cuomo issued Executive Order 202.68 (the "Order"), which, among other things,
7    limits the maximum allowable occupancy in "houses of worship" in certain zones
8    to 10 or 25 people.   Appellants Roman Catholic Diocese of Brooklyn (the
9    "Diocese") and Agudath Israel of America ("Agudath Israel") seek to enjoin the
10   Governor from enforcing the 10- and 25-person capacity limits.   They argue the
11   Order violates the Free Exercise Clause of the First Amendment.   The United States
12   District Court for the Eastern District of New York (Matsumoto, *J.*, & Garaufis, *J.*)
13   denied their motions for a preliminary injunction.
14
15             Appellants moved for injunctions pending appeal, which a divided motions
16   panel of this Court denied.   Appellants then sought injunctive relief from the
17   United States Supreme Court, which granted writs of injunction prohibiting the
18   Governor from enforcing the Order's 10- and 25-person capacity limits pending
19   disposition of this appeal.   *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 141
20   S. Ct. 63 (2020); *Agudath Israel v. Cuomo*, No. 20A90, 2020 WL 6954120 (U.S. Nov.
21   25, 2020).   The Supreme Court found that Appellants were likely to succeed on the
22   merits, applying strict scrutiny to the Order because it is not neutral on its face and
23   imposes greater restrictions on religious activities than on other activities the
24   Governor considers "essential."
25
26             In light of the Supreme Court's decision, we hold that the Order's regulation
27   of "houses of worship" is subject to strict scrutiny and that its fixed capacity limits
28   are not narrowly tailored to stem the spread of COVID-19.   Appellants have
29   established irreparable harm caused by the fixed capacity limits, and the public
30   interest favors granting injunctive relief.
31
32             With respect to the Diocese's appeal, No. 20-3590, we REVERSE and
33   REMAND with directions for the district court to issue a preliminary injunction
34   prohibiting the Governor from enforcing the Order's 10- and 25-person capacity
35   limits.   With respect to Agudath Israel's appeal, No. 20-3572, we REVERSE in part
36   and REMAND for the issuance of a preliminary injunction as to those fixed
37   capacity limits.   We also VACATE the district court's denial of Agudath Israel's

1  motion for a preliminary injunction as to the Order's 25% and 33% capacity limits,
2  and REMAND for the district court to determine in the first instance whether those
3  limits should be enjoined in light of the Supreme Court's decision and this opinion.
4
5                                              AVI SCHICK (W. Alex Smith, Misha Tseytlin,
6                                              *on the brief*), Troutman Pepper Hamilton
7                                              Sanders LLP, New York, NY & Chicago, IL,
8                                              *for Plaintiffs-Appellants in 20-3572.*
9
10                                             RANDY M. MASTRO (Akiva Shapiro, William
11                                             J. Moccia, Lee R. Crain, *on the brief*), Gibson,
12                                             Dunn & Crutcher LLP, New York, NY, *for*
13                                             *Plaintiff-Appellant in 20-3590.*
14
15                                             BRIAN D. GINSBERG (Barbara D. Underwood,
16                                             Solicitor General, Andrea Oser, Deputy
17                                             Solicitor General, Dustin J. Brockner,
18                                             Assistant Solicitor General, *on the brief*), *for*
19                                             Letitia James, Attorney General of the State
20                                             of New York, Albany, NY, *for Defendant-*
21                                             *Appellee in 20-3572 & 20-3590.*
22
23  PARK, *Circuit Judge*:

24          In response to the COVID-19 pandemic, the Governor of New York issued

25  an executive order limiting the maximum allowable occupancy in "houses of

26  worship" in certain "zones" to 10 or 25 people.  Other businesses that the Governor

27  considers to be "essential," however, face no such restrictions.  Appellants Roman

28  Catholic Diocese of Brooklyn (the "Diocese") and Agudath Israel of America

1   ("Agudath Israel") seek to enjoin the Governor from enforcing the capacity limits,

2   which they allege violate the Free Exercise Clause of the First Amendment.

3        The Supreme Court already found that Appellants have made "a strong

4   showing" that their claim is likely to prevail.  *See Roman Cath. Diocese of Brooklyn v.*

5   *Cuomo*, 141 S. Ct. 63, 66 (2020).  We agree.  The Governor's order is subject to strict

6   scrutiny because it is not neutral on its face and imposes greater restrictions on

7   religious activities than on secular ones.  We thus REVERSE and REMAND in part,

8   directing the district courts to enjoin the Governor from enforcing the Order's 10-

9   and 25-person capacity limits.  We VACATE and REMAND in part for the district

10  court to determine in the first instance whether the 25% and 33% capacity limits

11  can satisfy strict scrutiny.

12                        **I.  BACKGROUND**

13  A.    <u>COVID-19 and the Governor's Response</u>

14        More than 36,000 New Yorkers have died from COVID-19, and New York

15  has had the second-highest number of deaths per capita of any state.[1]  On

16  March 7, 2020, Governor Cuomo declared a disaster emergency in the State, which

17  allows him to exercise extraordinary executive powers.  *See* N.Y. Exec. Law § 28.

---

[1] *United States COVID-19 Cases & Deaths by State*, Ctrs. for Disease Control & Prevention, https://covid.cdc.gov/covid-data-tracker (updated Dec. 26, 2020).

1    He can "temporarily suspend any statute, local law, ordinance, or orders, rules or

2    regulations, or parts thereof, of any agency," and can "issue any directive . . .

3    necessary to cope with the disaster." *Id.* § 29-a.  Suspensions and directives under

4    this law expire after 30 days, but the Governor may renew them an unlimited

5    number of times.  *Id.*  The legislature of New York can terminate suspensions and

6    directives "by concurrent resolution," but the Governor's actions pursuant to

7    Executive Law § 29-a do not otherwise require legislative consultation or approval.

8    *Id.*

9         Governors have historically exercised this emergency authority in a limited

10   and localized manner, most often in response to natural disasters such as severe

11   storms or flooding.[2]  Governor Cuomo's executive orders during the COVID-19

12   pandemic, however, have been unprecedented in their number, breadth, and

13   duration.  From March to December 2020, he has issued almost 90 executive orders

---

[2] *See, e.g.*, N.Y. Exec. Order 195 (May 20, 2019) (declaring disaster emergency in specified counties due to "high water levels on Lake Ontario and the St. Lawrence River . . . causing the potential for lakeshore flooding, widespread erosion, and water damage"); N.Y. Exec. Order 193 (Jan. 19, 2019) (same, due to a "severe winter storm").

relating to the pandemic.[3]  Those orders affect nearly every aspect of life in the State, including restrictions on activities like private gatherings and travel.[4]

B.  Executive Order 202.68

In response to a rise in COVID-19 cases in certain "hot spots" in the State, on October 6, 2020, the Governor issued Executive Order 202.68 (the "Order"), the source of the restrictions challenged here.[5]  The Order authorizes the New York State Department of Health to "determine areas in the State that require enhanced public health restrictions," classifying those areas as red, orange, or yellow zones, and imposes zone-specific restrictions on various activities.

In red zones, the Order prohibits all "[n]on-essential gatherings," requires all "non-essential businesses" to "reduce in-person workforce by 100%," and allows restaurants to remain open "for takeout or delivery only."  The Order

---

[3] *See Executive Orders*, Off. of the Governor, https://www.governor.ny.gov/executive-orders (last visited Dec. 27, 2020).  By comparison, the Governor averaged around 35 executive orders per year in the preceding five years.  *See id.*

[4] *See, e.g.*, N.Y. Exec. Order 202.6 (Mar. 18, 2020) (ordering certain employers to "reduce [their] in-person workforce at any work locations by 50%"); N.Y. Exec Order 205.2 (Oct. 31, 2020) (requiring certain "travelers entering New York" from a non-contiguous state to "quarantine for a period of 14 days").

[5] Executive Order 202.68 was in effect through November 5, 2020.  On November 3, 2020, the Governor extended the restrictions contained in Executive Order 202.68 through December 3, 2020.  *See* N.Y. Exec. Order 202.72 (Nov. 3, 2020).  And on December 2, 2020, the Governor again extended the restrictions through January 1, 2021.  *See* N.Y. Exec. Order 202.79 (Dec. 2, 2020).

1    imposes no additional restrictions or limitations on other businesses or gatherings,

2    however, and schools may continue in-person instruction.[6]  The Order specifies

3    only one other category of entities in red zones:  "[H]ouses of worship," which are

4    subject to a capacity limit of "25% of maximum occupancy or 10 people, whichever

5    is fewer."

6          In orange zones, the Order limits "[n]on-essential gatherings" to 10 people

7    and directs the closure of "certain non-essential businesses, for which there is a

8    higher risk associated with the transmission of the COVID-19 virus," such as gyms

9    and tattoo parlors.   Restaurants may "provide outdoor service," all other

10   businesses are again free to operate without additional restrictions other than

11   those imposed by previous orders, and schools may remain open for in-person

12   instruction, subject again to testing requirements.  Again, "houses of worship" in

13   orange zones are separately identified and subject to a capacity limit of "33% of

14   maximum occupancy or 25 people, whichever is fewer."

---

[6] "Essential" businesses are subject to a 50% occupancy cap under earlier imposed restrictions.  The Order originally directed the closure of schools in red and orange zones, but was later modified to allow schools to "conduct in-person instruction . . . subject to compliance with guidance and directives of the Department of Health," including rigorous testing requirements.  *See* N.Y. Exec. Order 202.79 (Dec. 2, 2020).

1    In yellow zones, which are not at issue here, the Order limits "[n]on-

2    essential gatherings" to "no more than 25 people."  Indoor dining is permitted at

3    restaurants, and schools remain open.  No additional restrictions are imposed on

4    any businesses, whether "essential" or "non-essential."  Once more, however,

5    "houses of worship" are limited to "50% of [their] maximum occupancy."[7]

6    By its terms, the Order does not apply to "essential" businesses, which State

7    guidance describes as those "providing products or services that are required to

8    maintain the health, welfare and safety of the citizens of New York State."[8]  This

9    category includes not only grocery stores and hospitals, but also many businesses

10   with more questionable connections to "health, welfare, and safety"—including

11   liquor stores, pet shops, and financial institutions providing "services related to

12   financial markets."[9]  The Governor has neither explained the process by which he

13   deemed some businesses "essential" nor identified evidence supporting the

14   classifications.  Importantly, the Governor has not asserted that his categorization

---

[7] In yellow zones, other executive orders and regulations impose a similar 50% occupancy cap on all essential and non-essential businesses that is not apparent on the face of the Order.

[8] *Frequently Asked Questions for Determining Whether a Business Is Subject to a Workforce Reduction Under Recent Executive Order Enacted to Address COVID-19 Outbreak*, Empire State Dev., https://esd.ny.gov/sites/default/files/ESD_EssentialEmployerFAQ_032220.pdf.

[9] *See Essential Business Guidance Related to Determining Whether a Business Enterprise Is Subject to a Workforce Reduction Under Executive Order 202.68*, Empire State Dev., https://esd.ny.gov/ny-cluster-action-initiative-guidance (updated Dec. 15, 2020).

1  of businesses as "essential" or "non-essential" was based on any assessment of

2  COVID-19 transmission risk.

3       Before issuing the Order, the Governor made public statements indicating

4  that the restrictions were motivated in part by concerns about religious gatherings.

5  For example, he noted that the source of the first coronavirus hot spot in New York

6  "was an Orthodox Jewish man who went to a temple" and observed that

7  "Orthodox Jewish gatherings often are very, very large and we've seen what one

8  person can do in a group."[10]  The Governor then said that he would be meeting

9  with members of the "ultra-Orthodox [Jewish] community," and if they would

10 "not agree to enforce the rules, then we'll close the institutions down."  *Id.*  One

11 day later, he issued the Order.

12      Three days after issuing the Order, the Governor explained that it addresses

13 "a predominantly ultra-orthodox cluster."[11]  Five days later, he said the State was

14 "having issues in the Orthodox Jewish community in New York, where because

---

[10] *Governor Cuomo Updates New Yorkers on State's Progress During COVID-19 Pandemic*, Off. of the Governor (Oct. 5, 2020), https://www.governor.ny.gov/news/video-audio-photos-rush-transcript-governor-cuomo-updates-new-yorkers-states-progress-during-1.

[11] *Governor Cuomo Is a Guest on CNN Newsroom with Poppy Harlow and Jim Sciutto*, Off. of the Governor (Oct. 9, 2020), https://www.governor.ny.gov/news/audio-rush-transcript-governor-cuomo-guest-cnn-newsroom-poppy-harlow-and-jim-sciutto.

1   of their religious practices, . . . we're seeing a spread."[12]  He said that state-level

2   enforcement was necessary because the "ultra-Orthodox communities . . . are also

3   very politically powerful."[13]

4   The Order was not accompanied by any contemporaneous explanation of

5   its specific limits on houses of worship.  In this litigation, however, the Governor

6   offered declarations from Dr. Howard A. Zucker, Commissioner of the State

7   Department of Health, and Dr. Debra S. Blog, Director of the Department of

8   Health's Division of Epidemiology.  The declarations explained that "large

9   gatherings present the greatest risk for rapid and widespread transmission of the

10  virus in a community," citing reports of "super-spreader events" at a church in

11  Arkansas, a wedding in Maine, a religious service in India, and a choir practice in

12  Washington.  Joint App'x, No. 20-3590, at 312–18.  Comparing religious gatherings

13  to restaurants, the declarations also asserted that "the idea [of a religious service]

14  is a group of people coming together as a community to interact and pray

---

[12] Appellants' Br., No. 20-3572, at 9–10 (quoting Mairead McArdle, *Cuomo Says 'Religious Practices' of Orthodox Jews Causing Virus to Spread in New York City*, National Review (Oct. 14, 2020), https://www.nationalreview.com/news/cuomo-says-religious-practices-of-orthodox-jews-causing-virus-to-spread-in-new-york-city).

[13] *Governor Cuomo Announces State Will Withhold Funds for Localities and Schools in COVID-19 Cluster Zones If They Fail to Enforce Public Health Law*, Off. of the Governor (Oct. 14, 2020), https://www.governor.ny.gov/news/audio-rush-transcript-governor-cuomo-announces-state-will-withhold-funds-localities-and-schools.

1    together," that "[g]enerally, the congregants are arriving and leaving at the same

2    time and are together over an extended period of time," and that "[t]his type of

3    close interaction, while having deep meaning for the congregants, poses a higher

4    risk of transmission of the virus." *Id.* at 318.  The declarations did not purport to

5    assess the transmission risk of religious worship based on any data, much less to

6    compare religious worship with "essential" activities, and they did not explain

7    how the Governor arrived at the specific numerical and percentage capacity

8    limitations in the Order.

9        The Governor initially designated restricted zones in Brooklyn and Queens

10   in New York City, as well as in Broome, Orange, and Rockland counties.  Since

11   issuing the Order in October, the Governor has changed the zone designations at

12   least nine times.[14]

13   C.    Parties

14       1.    *Roman Catholic Diocese of Brooklyn*

15       The Diocese of Brooklyn is a Roman Catholic diocese with 210 churches in

16   Brooklyn and Queens.  In 2019, the Diocese held approximately 1,000 Masses each

17   Sunday, with an average weekly attendance of almost 230,000.

---

[14] The Governor announced changes to zone boundaries on October 21 and 28; November 6, 9, 11, 18, 19, and 23; and December 14.

1      Since March 2020, the Diocese has taken various precautions to protect its

2   parishioners and the community.  On March 16, 2020—before any government

3   lockdowns were imposed in New York—the Diocese canceled all public Masses.

4   Three days later, it ordered a complete shutdown of all of its churches, effective

5   on March 20.  During the shutdown, the Diocese convened a commission to

6   prepare for an eventual re-opening.  In consultation with medical professionals,

7   the commission developed a set of safety protocols, including regular cleaning of

8   churches, limited hours, and masking and distancing requirements.

9      In June 2020, the Diocese began to re-open for in-person Mass, beginning

10   with weekday services and expanding to weekend Masses in early July.  Since re-

11   opening, the Diocese has required each of its churches to abide by the safety

12   protocols developed by its commission, and Diocesan officials have inspected

13   services to ensure compliance.  In addition, the Diocese voluntarily limited all

14   church services to 25% of building capacity, maintaining this restriction even after

15   the State increased the statewide limit for gatherings beyond 25%.

16      The Diocese asserts that its safety protocols have been successful, and the

17   State's witness in the evidentiary hearing below acknowledged that he was

18   unaware of any COVID-19 outbreaks associated with churches in the Diocese.

1    2.    *Agudath Israel*

2    Agudath Israel of America is a national organization advocating for the

3    Orthodox Jewish community in the United States.  There are approximately 70

4    synagogues affiliated with Agudath Israel of America in New York, including

5    three of the appellants here.[15]

6    Like the Diocese, Agudath Israel has voluntarily instituted safety measures

7    to protect congregants and the local community.  Agudath Israel synagogues

8    suspended services in March and did not re-open until late May or early June.

9    Some have shortened the length of services, and others have split services into

10   multiple separate gatherings to decrease the number of congregants present at one

11   time; all have implemented mask requirements and other safety protocols in

12   compliance with State guidance.  The Governor does not dispute that there have

13   been no COVID-19 outbreaks in synagogues associated with Agudath Israel.

---

[15] The individual appellants in No. 25-3572 are rabbis and an official of these affiliated synagogues.  For simplicity, we refer to the appellants associated with Agudath Israel of America collectively as "Agudath Israel."

1   D.      Procedural History

2           1.      *District Court*

3           After the Governor issued the Order, the Diocese and Agudath Israel each

4   filed suit in the Eastern District of New York.   The Diocese sought to enjoin

5   enforcement of only the Order's 10- and 25-person fixed capacity limits (the "fixed

6   capacity limits"), while Agudath Israel sought an injunction against enforcement

7   of both the fixed capacity limits and the 25% and 33% capacity limits (the

8   "percentage capacity limits").

9           The district court denied the Diocese's motion for a preliminary injunction

10  after an evidentiary hearing.   *See Roman Cath. Diocese of Brooklyn v. Cuomo*,

11  No. 20-cv-4844, 2020 WL 6120167, at *1 & n.1 (E.D.N.Y. Oct. 16, 2020).   The district

12  court acknowledged that the Diocese had adequately alleged irreparable harm

13  based on the Order's "infringe[ment] on its religious practice."   *Id.* at *5.   But the

14  court applied rational-basis review, rather than strict scrutiny, and denied the

15  motion.   The district court relied on the Chief Justice's concurring opinion in *South*

16  *Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020), and various

17  decisions applying that opinion.   *Roman Cath. Diocese*, 2020 WL 6120167, at *9–10.

1    Agudath Israel likewise sought, and was denied, a temporary restraining

2    order and preliminary injunction from the district court.  In an oral ruling, the

3    court held that Agudath Israel had failed to show irreparable harm, reasoning that

4    its congregants "can continue to observe their religion but there will have to be

5    modifications."  Tr. of Proceedings at 66, No. 20-cv-4834 (E.D.N.Y. Oct. 9, 2020).

6    The district court also concluded that rational-basis review applied, that Agudath

7    Israel was unlikely to succeed on the merits, and that the remaining injunction

8    factor weighed in favor of the Governor's position.

9        2.    *Second Circuit*

10    The Diocese and Agudath Israel appealed the district courts' denials of

11    preliminary injunctions.  They also each filed emergency motions for injunctions

12    pending appeal in this Court.  In an order dated November 9, 2020, a divided panel

13    denied injunctive relief pending appeal, but set an expedited schedule for

14    resolution of the appeals.  *See Agudath Israel of Am. v. Cuomo*, 980 F.3d 222, 228

15    (2d Cir. 2020).  The panel majority, relying on the Chief Justice's *South Bay*

16    concurrence, agreed with the district courts that rational-basis review applied

17    because the Order "subjects religious services to restrictions that are similar to or,

18    indeed, *less severe than* those imposed on comparable secular gatherings."  *Id.* at

226.  Under that standard, the panel majority reasoned, the Order was likely to pass constitutional muster.  *Id.* at 227.

The dissenting member of the panel would have granted the injunctions pending appeal based on the view that the Order should be subject to strict scrutiny because it "singl[es] out 'houses of worship' for unfavorable treatment." *Id.* at 228 (Park, *J.*, dissenting).  In particular, the dissent noted, the Order places no additional restrictions on secular businesses deemed "essential" while imposing stringent capacity limits on "houses of worship."  *Id.* at 229–30.

3.    *Supreme Court*

After the denials of injunctive relief pending appeal, and while the underlying appeals of the preliminary injunction denials remained pending in this Court, the Diocese and Agudath Israel each applied for a writ of injunction in the Supreme Court.  They sought injunctions against enforcement of the Order's fixed capacity limits.

The Supreme Court granted injunctive relief for both applicants.  *See Roman Cath. Diocese*, 141 S. Ct. 63; *Agudath Israel v. Cuomo*, No. 20A90, 2020 WL 6954120 (U.S. Nov. 25, 2020).  Specifically, the Court "enjoined [the Governor] from enforcing Executive Order 202.68's 10- and 25-person occupancy limits" on the

1    applicants "pending disposition of the appeal in the United States Court of

2    Appeals for the Second Circuit and disposition of the petition for a writ of

3    certiorari, if such writ is timely sought." *Roman Cath. Diocese*, 141 S. Ct. at 65;

4    *Agudath Israel*, 2020 WL 6954120, at *1.

5         In a per curiam opinion, the Court held that the applicants satisfied the

6    injunction factors and "clearly established their entitlement to relief pending

7    appellate review." *Roman Cath. Diocese*, 141 S. Ct. at 66.  First, the Court found that

8    the applicants "made a strong showing that the challenged restrictions violate the

9    minimum requirement of neutrality to religion" because the restrictions "single

10   out houses of worship for especially harsh treatment."  *Id.* (cleaned up).  And

11   "[b]ecause the challenged restrictions are not neutral and of general applicability,"

12   the Court held, "they must satisfy strict scrutiny."  *Id.* at 67 (internal quotation

13   marks omitted).  The Order likely failed that standard, however, because "it is

14   hard to see how the challenged regulations can be regarded as 'narrowly

15   tailored.'"  *Id.*  In particular, the Court found that the fixed capacity limits are "far

16   more severe than has been shown to be required to prevent the spread of the virus

17   at the applicants' services" and that "there are many other less restrictive rules that

18   could be adopted to minimize the risk to those attending religious services."  *Id.*

17

1    The Court further held that "[t]here can be no question that the challenged

2    restrictions, if enforced, will cause irreparable harm." *Id.*  It also found that the

3    Governor had not "shown that granting the applications will harm the public,"

4    because the Governor "has not claimed that attendance at the applicants' services

5    has resulted in the spread of disease" and "has not shown that public health would

6    be imperiled if less restrictive measures were imposed." *Id.* at 68.

7                            **II.  DISCUSSION**

8    Appellants seek preliminary injunctions against enforcement of Executive

9    Order 202.68's fixed capacity limits, which restrict occupancy in "houses of

10   worship" to 10 people in red zones and 25 people in orange zones.  Agudath Israel

11   also seeks to enjoin the Order's percentage capacity limits of 25% of maximum

12   occupancy in red zones and 33% in orange zones.

13   In light of the Supreme Court's *Roman Catholic Diocese* decision, the

14   Governor has "withdraw[n] his objection to the entry of a preliminary injunction"

15   as to the fixed capacity limits.  Appellee's Br., No. 20-3572, at 30.  He continues to

16   maintain, however, that those limits "do not violate the Free Exercise Clause." *Id.*

17   And he defends the percentage capacity limits as constitutionally permissible,

1    arguing that they do not burden Agudath Israel's religious exercise and that they

2    may survive strict scrutiny.[16]

3    A.   <u>Legal Standard</u>

4         When "a preliminary injunction will affect government action taken in the

5    public interest pursuant to a statute or regulatory scheme, the moving party must

6    demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of

7    success on the merits, and (3) public interest weighing in favor of granting the

8    injunction." *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d

9    133, 143 (2d Cir. 2016) (internal quotation marks omitted).  We review a district

10    court's denial of a preliminary injunction for abuse of discretion, but "must assess

11    *de novo* whether the court proceeded on the basis of an erroneous view of the

12    applicable law." *Id.* (internal quotation marks omitted).

---

[16] The Governor also argued before the Supreme Court that this case was moot due to his modification of zone boundaries to remove the applicants' churches and synagogues from red and orange zones.  The Court squarely rejected that argument, as do we.  *See Roman Cath. Diocese*, 141 S. Ct. at 68 ("It is clear that this matter is not moot . . . [and that] injunctive relief is still called for because the applicants remain under a constant threat that the area in question will be reclassified as red or orange." (citation omitted)).  Notwithstanding the Supreme Court's November 25 decision, the Governor proceeded to renew the Order on December 2, including the challenged fixed capacity limits on houses of worship.

1    B.    Likelihood of Success on the Merits

2          1.    *Strict Scrutiny*

3          The First Amendment provides that the government "shall make no law

4    respecting an establishment of religion, or prohibiting the free exercise thereof."

5    U.S. Const. amend. I; *see Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940)

6    (incorporating the Free Exercise Clause against the states).  It is well established

7    that discrimination against religion is "odious to our Constitution."  *Trinity*

8    *Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2025 (2017).

9          The Free Exercise Clause protects both an individual's private right to

10   religious belief and "the performance of (or abstention from) physical acts that

11   constitute the free exercise of religion," including "'assembling with others for a

12   worship service.'"  *Cent. Rabbinical Cong. of U.S. & Can. v. N.Y.C. Dep't of Health &*

13   *Mental Hygiene*, 763 F.3d 183, 193 (2d Cir. 2014) (quoting *Emp. Div., Dep't of Hum.*

14   *Res. of Or. v. Smith*, 494 U.S. 872, 877 (1990)).  This protection "does not relieve an

15   individual of the obligation to comply with a valid and neutral law of general

16   applicability," *Smith*, 494 U.S. at 879 (internal quotation marks omitted), and such

17   a neutral and generally applicable policy is subject to only rational-basis review,

18   *Cent. Rabbinical Cong.*, 763 F.3d at 193.  Official action "burdening religious conduct

1   that is *not* both neutral and generally applicable, however, is subject to strict

2   scrutiny." *Id*.

3   "To determine neutrality, we begin with the [Order's] text, 'for the

4   minimum requirement of neutrality is that a [government policy] not discriminate

5   on its face.'" *Id.* (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508

6   U.S. 520, 533 (1993)).  The Order fails this basic standard by explicitly imposing on

7   "houses of worship" restrictions inapplicable to secular activities.  "In a red zone,

8   while a synagogue or church may not admit more than 10 persons, businesses

9   categorized as 'essential' may admit as many people as they wish," subject to only

10  the less stringent 50% capacity limit applicable to all businesses.  *Roman Cath.*

11  *Diocese*, 141 S. Ct. at 66.  And "[t]he disparate treatment is even more striking" in

12  orange zones, where "attendance at houses of worship is limited to 25 persons"

13  but most non-essential businesses must comply with only the generally applicable

14  50% capacity limit.  *Id.*  The fixed capacity limits thus "cannot be viewed as neutral

15  because they single out houses of worship for especially harsh treatment."  *Id.*

16  The Governor acknowledges that "the Supreme Court has seemingly

17  rejected the Governor's explanation" of why the Order's fixed capacity limits are

18  constitutional.  Appellee's Br., No. 20-3572, at 33.  He nevertheless continues to

1  argue that rational-basis review applies because those limits "do not disfavor

2  religious gatherings in houses of worship as compared with all secular activities

3  that present a similar or greater degree of risk of COVID-19 spread," like "concerts

4  and theatrical performances." *Id.* at 35 (internal quotation marks omitted). But

5  this only highlights the fact that the Order is not neutral towards religion.

6  Rational-basis review applies when a neutral and generally applicable policy

7  incidentally burdens religion; a policy that expressly singles out religion for less

8  favored treatment, as here, is subject to strict scrutiny. *See Roman Cath. Diocese*, 141

9  S. Ct. at 66–67; *Cent. Rabbinical Cong.*, 763 F.3d at 193–94 (2d Cir. 2014).

10      Moreover, the Order does not impose generally applicable public-health

11  guidelines, like requiring masks and distancing or limiting capacity by time.

12  Instead, the Governor has selected some businesses (such as news media, financial

13  services, certain retail stores, and construction) for favorable treatment, calling

14  them "essential," while imposing greater restrictions on "non-essential" activities

15  and religious worship. That lack of general applicability is also subject to strict

16  scrutiny.

17      Further, although the Governor asserts that "all" activities not restricted by

18  the Order present lesser risks of COVID-19 transmission than religious worship,

1    he has never claimed that the unrestricted category of "essential" activities was

2    created based on transmission risk.  Instead, "[t]he only explanation for treating

3    religious places differently seems to be a judgment that what happens there just

4    isn't as 'essential' as what happens in secular spaces."  *Roman Cath. Diocese*, 141

5    S. Ct. at 69 (Gorsuch, *J.*, concurring).  Courts apply strict scrutiny to assess whether

6    a government policy impermissibly "'devalues religious reasons' for congregating

7    'by judging them to be of lesser import than nonreligious reasons.'"  *Calvary Chapel*

8    *Dayton Valley v. Sisolak*, 140 S. Ct. 2603, 2614 (2020) (Kavanaugh, *J.*, dissenting)

9    (quoting *Lukumi*, 508 U.S. at 537–38).

10       The Supreme Court's *Roman Catholic Diocese* opinion addressed only the

11   fixed capacity limits, but the same reasoning applies to the Order's percentage

12   capacity limits, which by their own terms impose stringent requirements only on

13   houses of worship.  One could easily substitute the percentage capacity limits for

14   the fixed capacity limits into the Supreme Court's discussion of strict scrutiny

15   without altering the analysis.  Thus, both the fixed capacity and percentage

16   capacity limits on houses of worship are subject to strict scrutiny.[17]

---

[17] Agudath Israel also argues that the Order is subject to strict scrutiny for the independent reason that the Governor "gerrymandered" the initial zone boundaries to target Orthodox Jewish communities.  We need not reach this argument because we conclude that the Order discriminates against religion on its face.

1       2.      *Narrow Tailoring*

2       Applying strict scrutiny, the Order's restrictions on houses of worship are

3   constitutional only if they are "'narrowly tailored' to serve a 'compelling' state

4   interest." *Roman Cath. Diocese*, 141 S. Ct. at 67 (quoting *Lukumi*, 508 U.S. at 546).

5   As the Supreme Court observed, "[s]temming the spread of COVID-19 is

6   unquestionably a compelling interest." *Id.* The question is thus whether the

7   Order's fixed and percentage capacity limits are narrowly tailored to address that

8   public-health concern.

9       Narrow tailoring requires the government to demonstrate that a policy is

10  the "least restrictive means" of achieving its objective. *Thomas v. Rev. Bd. of Ind.*

11  *Emp. Sec. Div.*, 450 U.S. 707, 718 (1981). The government's justification "must be

12  genuine, not hypothesized or invented *post hoc* in response to litigation." *United*

13  *States v. Virginia*, 518 U.S. 515, 533 (1996); *see also United States v. Brennan*, 650 F.3d

14  65, 106 (2d Cir. 2011). And the government must show that it "seriously undertook

15  to address the problem with less intrusive tools readily available to it." *McCullen*

16  *v. Coakley*, 573 U.S. 464, 494 (2014). In short, "[t]o meet the requirement of narrow

17  tailoring, the government must demonstrate that alternative measures" imposing

24

lesser burdens on religious liberty "would fail to achieve the government's interests, not simply that the chosen route was easier." *Id.* at 495.

Regarding the fixed capacity limits, the Governor has never seriously contended that they are narrowly tailored to stem the spread of COVID-19, and he appears to concede as much here.  Those limits are "far more severe than has been shown to be required to prevent the spread of the virus at [Appellants'] services," particularly because the Governor has pointed to no evidence of any outbreaks related to Appellants' churches and synagogues. *Roman Cath. Diocese*, 141 S. Ct. at 67.  Most obviously, the 10- and 25-person restrictions do not account in any way for the sizes of houses of worship in red and orange zones.  Two Diocese churches originally affected by the Order seat over 1,000 people, and more than ten accommodate over 700.  Likewise, Agudath Israel of Kew Garden Hills has a capacity of over 400.  "It is hard to believe that admitting more than 10 people to a 1,000-seat church or 400-seat synagogue would create a more serious health risk than the many other activities that the State allows." *Id.*

The fixed capacity limits also bear little relation to the particular COVID-19 transmission risks the Governor identifies.  As an initial matter, the Governor's identification of those risks relied on broad generalizations made by public-health

1   officials about inherent features of religious worship.  *See, e.g.*, App'x, No. 20-3572,

2   at 294 ("Generally, the congregants are arriving and leaving at the same period

3   and are together over an extended period of time.").[18]  The government must

4   normally refrain from making assumptions about what religious worship

5   requires.  *See Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2055

6   (2020) ("The First Amendment protects the right of religious institutions 'to decide

7   for themselves, free from state interference, matters of church government as well

8   as those of faith and doctrine.'" (quoting *Kedroff v. Saint Nicholas Cathedral of*

9   *Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952))).  Even taking these

10  assertions at face value, however, the Governor must explain why the Order's

11  density restrictions targeted at houses of worship are more effective than generally

12  applicable restrictions on the duration of gatherings or requirements regarding

13  masks and distancing.  The Governor may not, of course, presume that religious

14  communities will not comply with such generally applicable regulations.  *See*

---

[18] Recent public statements from the Governor cast some doubt on his experts' claims that religious worship is self-evidently riskier than secular activities.  In an address on December 11, 2020, the Governor presented a chart showing that, per "Statewide Contact Tracing Data," "Religious Activities" were the exposure source for only 0.69% of new COVID-19 infections in the state from September through November.  This figure is comparable to, or lower than, the equivalent proportion for categories of activity deemed "essential": 0.84% for "Manufacturing," 0.66% for "Construction," and 0.55% for "Professional Services."  *See* Governor Andrew M. Cuomo, *Governor Cuomo Announces Updated Zone Metrics, Hospital Directives and Business Guidelines*, YouTube (Dec. 11, 2020), https://youtu.be/QA1TdlK146Y.

1    *Roberts v. Neace*, 958 F.3d 409, 414 (6th Cir. 2020) ("What [the Governor] can't do is

2    assume the worst when people go to worship but assume the best when people go

3    to work or go about the rest of their daily lives in permitted social settings.").  Here,

4    Appellants have in fact made clear that they would follow generally applicable

5    public-health regulations.

6          While essentially conceding that the fixed capacity limits are not narrowly

7    tailored, the Governor continues to defend the percentage capacity limits.  In

8    particular, he notes that the New York State Building Code calculates maximum

9    occupancy differently depending on the use of a particular building, and argues

10   that "using a uniform percentage-of-occupancy limit" for religious and secular

11   institutions alike "may produce very different results in terms of population

12   density."  Appellee's Br., No. 20-3572, at 40–41.  In other words, the Governor

13   appears to assert—for the first time in his opposition brief—that the percentage

14   occupancy limits were in fact a narrowly tailored effort to stem the tide of

15   COVID-19 transmission.

1    We remand for the district court to consider in the first instance whether the

2    percentage capacity limits can survive strict scrutiny.[19]  It bears noting, however,

3    that the Building Code's occupancy calculations do not refer to "houses of

4    worship," but are instead based on neutral considerations like the type of seating

5    used and the "function of [the] space."  N.Y. State Building Code §§ 1004.5, 1004.6.

6    In addition, the Governor's invocation of the Building Code for the first time on

7    appeal suggests a *post hoc* rationalization.  *Cf., e.g., Colo. Christian Univ. v. Weaver*,

8    534 F.3d 1245, 1268 (10th Cir. 2008) (McConnell, *J.*) ("We cannot and will not

9    uphold a statute that abridges an enumerated constitutional right on the basis of a

10   factitious governmental interest found nowhere but in the defendants' litigating

11   papers.").    Indeed, it appears to highlight the absence of contemporaneous

---

[19] Before the Supreme Court's *Roman Catholic Diocese* decision, all parties to this litigation were focused primarily on the Order's fixed capacity limits.  Agudath Israel chose to challenge only those limits in its application for injunctive relief in the Supreme Court.  Similarly, Agudath Israel's counsel represented to this Court during oral argument on its motion for an injunction pending appeal that it was not, at that time, objecting to the 25% capacity restriction.  Under these circumstances, we remand Agudath Israel's motion for a preliminary injunction as to the percentage capacity limits for the district court to decide in the first instance in light of the Supreme Court's decision and this opinion.  *Cf. Robinson v. Murphy*, No. 20A95, 2020 WL 7346601 (U.S. Dec. 15, 2020) (vacating order denying injunctive relief, sought against enforcement of New Jersey's percentage capacity limits on indoor gatherings, and remanding to the Third Circuit "with instructions to remand to the District Court for further consideration in light of" *Roman Catholic Diocese*).

1    evidence about where the specific percentage capacity limits for houses of worship

2    came from.

3        3.    *COVID-19 and Judicial Review*

4        Finally, the context of a public-health emergency does not change the result.

5    The district courts, the motions panel of this Court, and the Governor relied on

6    *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), as support for the notion that courts

7    should defer to the executive in the face of the COVID-19 pandemic.[20]  But this

8    reliance on *Jacobson* was misplaced.

9        In *Jacobson*, the Supreme Court upheld a mandatory vaccination law against

10   a substantive due process challenge.  *Jacobson* predated the modern constitutional

11   jurisprudence of tiers of scrutiny, was decided before the First Amendment was

12   incorporated against the states, and "did not address the free exercise of religion."

13   *Phillips v. City of New York*, 775 F.3d 538, 543 (2d Cir. 2015); *see Roman Cath. Diocese*,

14   141 S. Ct. at 70 (Gorsuch, *J.*, concurring) ("*Jacobson* hardly supports cutting the

15   Constitution loose during a pandemic.   That decision involved an entirely

---

[20] The district courts, motions panel, and Governor also relied heavily on the Chief Justice's concurring opinion in *South Bay*.  Whatever persuasive value that opinion may have had in the early months of the COVID-19 pandemic, the Supreme Court's decision in *Roman Catholic Diocese* has supplanted *South Bay*.  *See Roman Cath. Diocese*, 141 S. Ct. at 70 (Gorsuch, *J.*, concurring) ("Rather than apply a nonbinding and expired concurrence from *South Bay*, courts must resume applying the Free Exercise Clause.").

1    different mode of analysis, an entirely different right, and an entirely different

2    kind of restriction.").  Indeed, the *Jacobson* Court itself specifically noted that "even

3    if based on the acknowledged police powers of a state," a public-health measure

4    "must always yield in case of conflict with . . . any right which [the Constitution]

5    gives or secures."  197 U.S. at 25.

6        The fact that this case arises from a global pandemic is most relevant at the

7    first prong of strict scrutiny—that is, "[s]temming the spread of COVID-19 is

8    unquestionably a compelling interest."  *Roman Cath. Diocese*, 141 S. Ct. at 67.  Our

9    focus then turns to whether the restrictions at issue are narrowly tailored and use

10   the least restrictive means available to achieve that interest.  To be sure, the

11   uncertainties that accompany many novel emergencies may make it difficult to

12   assess whether, for example, a less restrictive alternative actually exists—calling

13   for a measure of humility on the part of the reviewing judge.  But we grant no

14   special deference to the executive when the exercise of emergency powers

15   infringes on constitutional rights.  That is precisely what the three-tiered

16   framework for analyzing constitutional violations is for, and courts may not defer

17   to the Governor simply because he is addressing a matter involving science or

18   public health.  "[E]ven in a pandemic, the Constitution cannot be put away and

1   forgotten." *Id*. at 68; *see also id.* (confirming that "we have a duty to conduct a

2   serious examination" into the necessity of public-health measures that infringe on

3   constitutionally protected rights); *Calvary Chapel*, 140 S. Ct. at 2615 (Kavanaugh, *J.*,

4   dissenting) ("[H]istory is littered with unfortunate examples of overly broad

5   judicial deference to the government when the government has invoked

6   emergency powers and asserted crisis circumstances to override equal-treatment

7   and free-speech principles.").

8        To be clear, the First Amendment does not categorically exempt houses of

9   worship from government regulation.  *See, e.g.*, *Roman Cath. Diocese*, 141 S. Ct. at

10   74 (Kavanaugh, *J.*, concurring) ("In light of the devastating pandemic, I do not

11   doubt the State's authority to impose tailored restrictions—even very strict

12   restrictions—on attendance at religious services and secular gatherings alike.").

13   And judges "are not public health experts" and "should respect the judgment of

14   those with special expertise and responsibility in this area."  *Id.* at 68.  But where

15   government regulations "single out houses of worship for especially harsh

16   treatment," the government must demonstrate that its policies are narrowly

17   tailored.  *Id*. at 66.  The Governor has failed to do that in this case.

1    C.    <u>Irreparable Harm</u>

2        As the Supreme Court held, "[t]here can be no question that the [fixed

3    capacity limits], if enforced, will cause irreparable harm."  *Id.* at 67.  "The loss of

4    First Amendment freedoms, for even minimal periods of time, unquestionably

5    constitutes irreparable injury."  *Id.* (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)

6    (plurality op.)).  And Appellants have clearly shown that the fixed capacity limits

7    impair their free exercise of religion by severely restricting the number of

8    congregants who may participate in worship services.

9        The Diocese presented evidence that its parishioners were "devastated" by

10    the effective closure of its churches, with some "crying" "at the front door" when

11    told they could not enter.  Joint App'x, No. 20-3590, at 657.  Likewise, Agudath

12    Israel submitted unrebutted testimony that it would be "impossible" for its

13    congregants to "comply with both their religious obligations and the limitations

14    of" the Order.  App'x, No. 20-3572, at 257.  As the Supreme Court observed:

15        If only 10 [or 25] people are admitted to each service, the great
16        majority of those who wish to attend Mass on Sunday or services in a
17        synagogue on Shabbat will be barred.  And while those who are shut
18        out may in some instances be able to watch services on television,
19        such remote viewing is not the same as personal attendance.
20        Catholics who watch a Mass at home cannot receive communion, and
21        there are important religious traditions in the Orthodox Jewish faith
22        that require personal attendance.

1    *Roman Cath. Diocese*, 141 S. Ct. at 67–68.

2        The court below concluded that Agudath Israel had not demonstrated

3    irreparable harm because its congregants could "continue to observe their

4    religion" with "modifications."  This was error.  *See, e.g.*, *Hernandez v. Comm'r*, 490

5    U.S. 680, 699 (1989) ("It is not within the judicial ken to question the centrality of

6    particular beliefs or practices to a faith, or the validity of particular litigants'

7    interpretations of those creeds.").  Religious adherents are not required to establish

8    irreparable harm independent of showing a Free Exercise Clause violation because

9    a "presumption of irreparable injury . . . flows from a violation of constitutional

10   rights."  *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996).  Nevertheless, as Agudath

11   Israel explained, Orthodox Jews are obligated to have an in-person minyan—a

12   quorum—before some of Judaism's most sacred rituals.  Orthodox Jews also desist

13   from using electronics on Shabbat, so in-person gatherings are necessary for

14   Agudath Israel's congregants.  Appellants have demonstrated irreparable harm

15   that would result without a preliminary injunction against enforcement of the

16   Order's fixed capacity limits on houses of worship.

17       As to the percentage capacity limits, if the district court concludes that the

18   plaintiffs are likely to prevail on their Free Exercise claims, it would follow that

1    the Order causes irreparable harm.  *See Elrod*, 427 U.S. at 373; *Jolly*, 76 F.3d at 482;

2    *Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir. 1992) (noting that a plaintiff "has

3    sufficiently demonstrated for preliminary injunction purposes that he may suffer

4    irreparable harm arising from a possible deprivation of his constitutional rights");

5    *see also* 11A Charles Allen Wright & Arthur R. Miller, *Federal Practice & Procedure*

6    § 2948.1 (3d ed. 2020) ("When an alleged deprivation of a constitutional right is

7    involved, such as . . . freedom of religion, most courts hold that no further showing

8    of irreparable injury is necessary." (footnote omitted)).  Because the deprivation of

9    First Amendment rights is an irreparable harm, in First Amendment cases "the

10   likelihood of success on the merits is the dominant, if not the dispositive, factor."

11   *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013).

12   D.    <u>Public Interest</u>

13          The remaining injunction factor, the interest of the public, also favors

14   granting injunctive relief.  As the Supreme Court noted, "it has not been shown

15   that granting the applications will harm the public," because the Governor has not

16   "claimed that attendance at [Appellants'] services has resulted in the spread of the

17   disease" or demonstrated that "public health would be imperiled if less restrictive

18   measures were imposed."  *Roman Cath. Diocese*, 141 S. Ct. at 68.

1        No public interest is served by maintaining an unconstitutional policy when

2        constitutional alternatives are available to achieve the same goal.  The restrictions

3        challenged here specially and disproportionately burden religious exercise, and

4        thus "strike at the very heart of the First Amendment's guarantee of religious

5        liberty."  *Id.*  Such a direct and severe constitutional violation weighs heavily in

6        favor of granting injunctive relief.

7        **III.  CONCLUSION**

8        For the reasons set forth above, with respect to the Diocese's appeal,

9        No. 20-3590, the district court's order is reversed.  We remand to the district court

10      with directions to grant a preliminary injunction against enforcement of the

11      Order's 10- and 25-person occupancy limits on houses of worship.

12        With respect to Agudath Israel's appeal, No. 20-3572, the district court's

13      order is likewise reversed to the extent that it denied Agudath Israel's motion for

14      a preliminary injunction as to the Order's fixed capacity limits, and we remand to

15      the district court with directions to grant a preliminary injunction against

16      enforcement of those limits.  The district court's order is vacated to the extent that

17      it denied a preliminary injunction against enforcement of the Order's 25% and 33%

18      capacity limits on houses of worship.  As to those limits, we remand for further

1    proceedings consistent with this opinion, including the application of strict

2    scrutiny in the analysis of Agudath Israel's likelihood of success on the merits.

3         In the interest of judicial economy, all further proceedings and subsequent

4    appeals shall be referred to this panel.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit