UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

AGUDATH ISRAEL OF AMERICA, AGUDATH ISRAEL OF
KEW GARDEN HILLS, AGUDATH ISRAEL OF MADISON,
AGUDATH ISRAEL OF BAYSWATER, RABBI YISROEL
REISMAN, RABBI MENACHEM FEIFER, STEVEN
SAPHIRSTEIN,

                                                     Plaintiffs,

Civil No. 1:20-cv-04834 (KAM)

        vs.

ANDREW M. CUOMO,
Governor of the State of New York, in his official capacity,

                                                    Defendant.

## PLAINTIFFS' PRE-HEARING MEMORANDUM OF LAW
## IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

STATEMENT OF FACTS ................................................................................. 3

    I.    The Synagogues And Their Response To COVID-19 ........................... 3

    II.    Defendant's COVID-19 Business Closure And Gathering Restrictions .............. 4

    III.    Defendant's Discriminatory New COVID-19 Restrictions ................... 5

    IV.    Transmission And Effective Mitigation Of COVID-19 ....................... 9

PROCEDURAL HISTORY ............................................................................... 11

ARGUMENT ...................................................................................................... 17

    I.    The Order's Favorable Capacity Limits On Other Activities Shows That Defendant Believes Less Restrictive Means Are Sufficient To Curb COVID-19 Spread ........................................................................... 18

    II.    Defendant's Proffered Justifications Fail To Establish That The Order's 25% And 33% Capacity Restrictions On Houses Of Worship Are Narrowly Tailored ............................................................................. 20

CONCLUSION ................................................................................................... 21

# TABLE OF AUTHORITIES

CASES                                                                                    Page(s)

*Agudath Israel of Am. v. Cuomo,*
    2020 U.S. App. LEXIS 35354 (2d Cir. Nov. 9, 2020)..........................................................6, 12

*Agudath Israel of Am. v. Cuomo,*
    592 U.S. __, 2020 U.S. LEXIS 5707 (Nov. 25, 2020) ...........................................................12

*Roman Catholic Diocese of Brooklyn, N.Y. v. Cuomo,*
    592 U.S. __, 2020 U.S. LEXIS 5708 (Nov. 25, 2020) ................................................... *passim*

*Soos v. Cuomo,*
    2020 U.S. Dist. LEXIS 111808 (N.D.N.Y. June 26, 2020).....................................................5

STATUTES

28 U.S.C. § 1651(a) ...........................................................................................................................12

OTHER AUTHORITIES

N.Y. Exec. Order No. 202.68.................................................................................................... *passim*

N.Y. Exec. Order No. 202.72.......................................................................................................9

N.Y. Exec. Order No. 202.79.......................................................................................................9

N.Y. Exec. Order No. 202.87.......................................................................................................9

N.Y. Exec. Order No. 202.91.......................................................................................................9

N.Y. Exec. Order No. 202.92.......................................................................................................9

Br. for Defendant-Appellee at 27 n.12, *Agudath Israel of Am. v. Cuomo*, No. 20-3572 (2d Cir.), ECF 127....................................................................................................................5

Declaration of Howard A. Zucker, *The Roman Catholic Diocese of Brooklyn, N.Y. v. Cuomo*, No. 1:20-cv-04844 (E.D.N.Y.), Dkt. 29-1 ....................................................................7

New York "Micro-Cluster" Strategy (Oct. 21, 2020)...................................................................8

Plaintiffs Agudath Israel of America, Agudath Israel of Kew Garden Hills, Agudath Israel of Madison, Rabbi Yisroel Reisman and Steven Saphirstein (together, "Plaintiffs") respectfully submit this pre-hearing memorandum in support of their motion for a preliminary injunction to enjoin Defendant Andrew M. Cuomo, and all those acting in concert with him, from enforcing the 25% and 33% capacity limits imposed on houses of worship pursuant to New York Executive Order No. 202.68 (the "Order"), as extended, in any and all geographic areas that currently are, or may be in the future, designated for such restrictions up through the entry of final judgment.

## INTRODUCTION

This case is on remand from the United States Court of Appeals for the Second Circuit with direction to apply strict scrutiny to the 25% and 33% capacity limits on houses of worship in Red Zones and Orange Zones, respectively, as set forth in the Order. This Court already has entered a preliminary injunction enjoining Defendant from enforcing the Order's 10- and 25-person restrictions, as directed by the Second Circuit.

The Second Circuit has held that the Order's 25% and 33% capacity limits similarly "are subject to strict scrutiny" because they "expressly single[ ] out religion for less favored treatment." Dkt. 26 at 22. The Second Circuit recognized that, on remand, Defendant bears the burden of proving that these limits are "the least restrictive means of" stemming the spread of COVID-19, emphasizing that Defendant "must demonstrate that alternative measures imposing lesser burdens on religious liberty would fail to achieve" these interests and that Defendant's "justification must be genuine, not hypothesized or invented *post hoc* in response to litigation." *Id.* at 24–25 (citation omitted).

The Second Circuit also stated that "[b]ecause the deprivation of First Amendment rights is an irreparable harm," "if Defendant fails to prove that the capacity limits are narrowly tailored

such that Plaintiffs are likely to prevail on their Free Exercise claims, it would follow that the Order causes irreparable harm," and that the public interest favors injunctive relief. *Id.* at 32–35.

Defendant cannot prove that the Order's capacity limits satisfy strict scrutiny. Defendant admitted as much in his February 2, 2021 letter to this Court stating that "he does not contest the entry of a preliminary injunction against these capacity limits" on houses of worship "[i]n light of the decisions made in this case by this Court and the appellate courts that have considered it." Pls. Ex. R. Public health guidance, including the Centers for Disease Control and Prevention ("CDC") guidelines, demonstrates that congregants can adequately protect against the transmission of COVID-19 at houses of worship by adhering to health protocols such as social distancing, masking, and sanitization, that are less restrictive than the Order's arbitrary 25% and 33% capacity limits. And the Order's more lenient capacity limits imposed on secular and commercial conduct and activities characterized as "essential," with the same social distancing, masking, and sanitization protocols in place as for houses of worship, show that even Defendant acknowledges that less restrictive means are sufficient to stem the spread of COVID-19 at houses of worship.

Defendant's reliance on generalities relating to gatherings and spread of the virus during the earliest days of the pandemic fails to justify the disparate capacity limits on houses of worship. Indeed, recent disclosures by State health officials reveal that the Order's capacity restrictions are not driven by State public health guidance, as "the State Health Department was not deeply involved in final decisions that have included allowing public events and mandating business closures based on color-coded 'microclusters,'" and that State health officials "found out about major changes in pandemic policy only after [Defendant] announced them at news conferences – and then asked them to match their health guidance to the announcements." Pls. Ex. Q at 2–3.

Because Defendant has failed to establish that the Order's 25% and 33% capacity limits survive strict scrutiny, Plaintiffs are likely to succeed on the merits of their claims that those limits violate the Free Exercise Clause.  It follows that the restrictions cause Plaintiffs irreparable injury and that the public interest favors injunctive relief.  And although Plaintiffs' synagogues are not currently in areas designated by Defendant for these stringent capacity limits, as the Supreme Court concluded in this case, "injunctive relief is still called for because [Plaintiffs] remain under a constant threat that the area in question will be reclassified" and "there is no reason why [Plaintiffs] should bear the risk of suffering further irreparable harm in the event of another reclassification." *Roman Catholic Diocese of Brooklyn, N.Y. v. Cuomo*, 592 U.S. __, 2020 U.S. LEXIS 5708, at *8–9 (Nov. 25, 2020) (per curiam).

## STATEMENT OF FACTS

### I.      The Synagogues And Their Response To COVID-19

Congregate worship in synagogues are a necessary and essential component of religious practice for Orthodox Jews in New York.  Orthodox Jews attend synagogue every day for congregate worship, and the services that the synagogues conduct on Saturdays and Jewish holidays form a vital part of religious worship.   Dkts. 2-19 ¶ 2; 2-20 ¶ 2; 2-21 ¶ 2.

When the COVID-19 pandemic began in early-2020, Plaintiffs' synagogues implemented rigorous health protocols and altered congregation to safeguard against COVID-19 transmission. Plaintiffs split traditional services into separate gatherings, which ensures that congregants maintain proper distancing.   Dkts. 2-19 ¶¶ 3–4; 2-20 ¶ 3; 2-21 ¶¶ 3–4.   Plaintiffs require congregants to wear masks during the entirety of the services, and congregants have fully complied with the policy.  *Id.*  By implementing health protocols, Plaintiffs have allowed their members to practice their religious beliefs while safeguarding against the spread of COVID-19.   As the

Supreme Court recognized, Defendant "does not dispute" that Plaintiffs have "rigorously implemented and adhered to all health protocols and that there has been no outbreak of COVID-19 in [Plaintiffs'] congregations." *Diocese*, 2020 U.S. LEXIS 5708, at *5–6.

## II.    Defendant's COVID-19 Business Closure And Gathering Restrictions

Defendant issued Executive Order No. 202 on March 7, 2020, declaring a disaster emergency in New York in light of COVID-19.  Pls. Ex. A.  In the following months, Defendant issued dozens of orders imposing business closures, gathering restrictions, and other requirements.

In March 2020, Defendant issued a series of executive orders closing businesses and restricting in-person gathering.  Defendant issued Executive Order Nos. 202.6 and 202.8, which required all non-essential businesses or entities to close.  In accordance with these orders, the Empire State Development Corporation issued guidance designating a wide array of "essential businesses" that were exempt from Defendant's closure orders.  Pls. Ex. E.  The State's definition of an "essential" business is broad, including, among many other activities, certain retail, financial institutions, the manufacturing and construction industries, and public transportation. *Id.*; *see also* Pls. Ex. F (designating "essential" businesses for purposes of the Order's Red Zones).

The New York Department of Health has issued industry-specific health protocols for some businesses designated as "essential."  For example, the State imposes capacity limits of 50% occupancy on the following "essential" businesses: certain retail (such as grocery stores, farmer's markets, and convenience stores), certain office-based activities, and manufacturing.  Pls. Exs. I at 3–6; J at 3–6; L at 2–4.  For construction and public transportation, the State requires only that participants maintain social distancing.  Pls. Exs. K at 2–4; M at 3–6.  The protocols for all such activities include provisions relating to facial coverings, social distancing, sanitization, screening, and other requirements designed to prevent the transmission of COVID-19.  Pls. Exs. I–M.

All regions of the State currently are in Phase Four (the final phase) of the State's reopening plan. In this Phase, all non-essential businesses must remain closed unless allowed to reopen under industry-specific health guidance from the Department of Health. Similar to (and the same, in many cases) the guidelines for "essential" businesses, these guidelines provide protocols for non-essential businesses relating to capacity limits, physical distancing, protective equipment, and screening. *Id.* For many businesses considered "non-essential" but permitted to reopen in Phase Four, such as offices, retail stores, and malls, State guidelines generally limit capacity to 50% of maximum occupancy. Pls. Exs. I at 3–6; J at 3–6; N at 3–6. For religious services in Phase Four, State issued revised rules on February 2, 2021 that provide: "the congregant/attendee capacity is limited to no more than 50% of the maximum occupancy for a particular area as set by the certification of occupancy for services occurring indoors." Pls. Ex. G at 2.[1]

III.   **Defendant's Discriminatory New COVID-19 Restrictions**

1. On October 6, 2020, Defendant issued the Order. Pls. Ex. C. The Order does not provide any generally applicable metrics that trigger a neighborhood's designation as a restricted zone. Rather, the Order states simply that "[t]he Department of Health shall determine areas in the State that require enhanced public health restrictions based upon cluster-based cases of COVID-19 at a level that compromises the State's containment of the virus." *Id.* at 1. The Order classifies each disfavored area as a "Red Zone," "Orange Zone," or "Yellow Zone," and imposes different restrictions on each zone. *Id.* at 2. The Order provides that "any permitted activities, in all three

---

[1] When Defendant issued the Order on October 6, State guidance imposed a restriction on houses of worship of "no more than 33% of the maximum occupancy for a particular area as set by the certification of occupancy for services." Pls. Ex. H at 2. The district court in *Soos v. Cuomo*, 2020 U.S. Dist. LEXIS 111808 (N.D.N.Y. June 26, 2020), enjoined enforcement of limits under 50% capacity on houses of worship. Defendant has acknowledged in this case that the pre-February 2, 2021 guidelines imposed a 50% capacity limit on houses of worship. *See* Tr. 37–38; Br. for Defendant-Appellee at 27 n.12, *Agudath Israel of Am. v. Cuomo*, No. 20-3572 (2d Cir.), ECF 127.

zones below, shall be conducted in strict adherence to Department of Health guidance," and it institutes a civil penalty of $15,000 per day for violations. *Id.* at 1.

In the "Red Zone," the Order restricts houses of worship "to a capacity limit of 25% of maximum occupancy or 10 people, whichever is fewer." Pls. Ex. C at 2. All "[ ]essential" businesses (as well as "essential" gatherings—an undefined term), are not subject to the restrictive capacity limitations imposed on houses of worship. *Id.* Most "essential" businesses thus remain subject to 50% (or greater) capacity limits set forth in State guidance. *See supra* 4.

In the "Orange Zone," the Order restricts houses of worship to "a maximum capacity limit of the lesser of 33% of maximum occupancy or 25 people, whichever is fewer." Pls. Ex. C at 2. Defendant allows all "essential" businesses and most non-essential businesses to operate at 50% (or greater) capacity in Orange Zones, *see supra* 4–5, and exempts "essential" gatherings. *Id.*

In issuing the Order, Defendant announced the restrictions would apply only to specific areas in Brooklyn and Queens, as well as in Broome, Orange, and Rockland Counties. Dkts. 2-9 at 2; 2-13 at 9–14. There are hundreds of synagogues in the restricted areas, Dkt. 2-17 ¶ 3, and tens of thousands of Orthodox Jews in New York live within the areas affected by Defendant's restrictions, *id.* at ¶ 4. Thus, the brunt of the religious burden that the Order immediately imposed was on Orthodox Jewish worshippers. Dkt. 2-19 ¶¶ 16–17; 2-20 ¶¶ 15–16; 2-21 ¶¶ 16–17.[2]

---

[2] As Plaintiffs showed in their Emergency Motion for Order to Show Cause for Temporary Restraining Order and Preliminary Injunction, Dkt. 2, and the Supreme Court recognized, Defendant also made numerous comments "in connection with the challenged rules [that] can be viewed as targeting the 'ultra-Orthodox [Jewish] community.'" *Diocese*, 2020 U.S. LEXIS 5708 at *3 (alteration in original) (quoting *Agudath Israel of Am. v. Cuomo*, 2020 U.S. App. LEXIS 35354, at *13 (2d Cir. Nov. 9, 2020) (Park, J., dissenting)).

2. Since issuing the Order, Defendant has provided various reasons in an attempt to explain his zone designations. All involve significant discretion vested in Defendant to decide which community has harsh restrictions imposed on them and which neighborhoods do not.

After the filing of this lawsuit, on October 9, Defendant's *only* purported justification for his originally-designated restricted zones was that "while most of New York City has a rate of positive tests around 1%, the red zone area had a positivity rate of approximately 8% which is alarming." Dkt. 12 ¶ 82. Defendant did not disclose whether he restricted other areas in the State with "approximately 8%" positivity rates, or whether he used objective geographic criteria, such as zip code or municipal boundaries, in carving his restricted zones. He did not state whether every street or block of the Red Zone area in New York City carried an approximately 8% positivity rate, or whether the Red Zone groups together areas with much higher and much lower averages. Nor does Defendant even attempt to explain the basis for a positivity rate of approximately 8% as justifying Red Zone restrictions.

On October 16, Defendant claimed to reveal what "steps the State needs to take to address areas of concern with higher positivity rates" in designating or re-designating zones. He provided that "[a]n area may be placed in a 'Red Zone'" if it has a 3% or higher positivity rate "for a sustained period of time," among other factors. Declaration of Howard A. Zucker, *The Roman Catholic Diocese of Brooklyn, N.Y. v. Cuomo*, No. 1:20-cv-04844 (E.D.N.Y.), Dkt. 29-1 at ¶ 12. He conceded that "[t]here is no specific percentage or threshold to determine when an area should be designed as an Orange or Yellow Zone," stating only that Defendant considers multiple, unspecified factors for deciding whether to impose those restrictions on an area. *Id.* at ¶ 20.

On October 21, Defendant released new criteria, tied to positivity and testing rates and other discretionary factors.  *See* New York "Micro-Cluster" Strategy (Oct. 21, 2020).[3]  These guidelines provided target metrics for an area to be subject to new or revised restrictions, tied to positivity rates and a myriad of other factors, which included, among other things, "community cooperation to reduce viral spread" and "age and demographic information."  *Id.* at 3, 5–9.

On December 11, Defendant issued still new criteria.  Under these metrics, "[a] red zone will be implemented in a region where hospital capacity is within 21 days of reaching 90 percent, even after the cancellation of elective procedures and a 50 percent increase in bed capacity in hospitals in the region."  Pls. Ex. P.  Defendant *may* designate an area as an Orange Zone if it "has a 4 percent positivity rate (7-day average) over the last 10 days and it is located in a region that has reached 85 percent hospital capacity," or if the State "determines the area or region's rate of hospital admissions is unacceptably high and a zone designation is appropriate to control the rate of growth."  *Id.*  An area is eligible as a Yellow Zone "if it has a 3% positivity rate (7-day average) over the past 10 days and is in the top 10 percent in the state for hospital admissions per capita over the past week and is experiencing week-over-week growth in daily admissions."  *Id.*

On December 11, Defendant disclosed statewide COVID-19 contact tracing data showing various activities' share of COVID-19 exposure from September through November:

---

[3]      Available     at     https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/MicroCluster_Metrics_10.21.20_FINAL.pdf/.



Pls. Ex. P.  Religious activity accounted for only 0.69% of statewide COVID-19 exposure.  *Id.* Activities permitted to operate at greater capacity limits than houses of worship accounted for greater or similar exposure: public/private transit at 0.96%, manufacturing at 0.84%, construction at 0.66%, retail at 0.61%, and professional services at 0.55%.  *Id.*

On January 27, 2021, Defendant again extended the Order's restrictions through February 26, 2021 in New York Executive Order No. 202.92.  Pls. Ex. D.[4]  The Executive Order was extended with its restrictions on houses of worship unchanged (including those already enjoined).

**IV.    Transmission And Effective Mitigation Of COVID-19**

Current research shows that COVID-19 "is primarily spread through exposure of airborne respiratory droplets to our mucous membranes in the nose and the mouth and the airways." Declaration of Timothy P. Flanigan, M.D. ("Dr. Flanigan Decl.") ¶ 16, attached hereto as Exhibit

---

[4] *See also* N.Y. Exec. Order Nos. 202.91, 202.87, 202.79, 202.72.

A.  COVID-19 also is spread "through fomite transmission, which is contact with the virion resting on a surface and then touching the mucous membranes in the mouth, nose, or eyes."  *Id.*

Social distancing, facial coverings, and sanitization adequately mitigates the risk of COVID-19 transmission.  As Dr. Timothy P. Flanigan, a leading COVID-19 research and treatment expert, explains, because "[i]t is impossible, particularly with a virus as widespread as SARS-Cov-2 [COVID-19], to prevent all transmission," the "goal of public health officials and infectious disease experts is to slow the rate of transmission to ensure that hospitals and health care workers are not overwhelmed, while taking extra measures to protect the most vulnerable."  *Id.* at ¶ 27.  "Mitigating the spread of SARS-CoV-2 begins with the three Ws: watch your distance, wear your mask, and wash your hands."  *Id.* at ¶ 21.  Social distancing "prevents the spread of SARS-CoV-2 by limiting the spread of virions between individuals," as "[l]arger respiratory droplets (which are capable of carrying a larger viral load) tend to fall to the ground within 3 to 5 feet of the individual."  *Id.* at ¶ 22.  Masks "work primarily to prevent an infected persons from spreading COVID-19 by trapping large respiratory droplets within the mask" and "also prevent hand-to-mouth or hand-to-nose transmission of fomites."  *Id.* at ¶ 24.  Hand hygiene and other sanitization measures "kill[ ] the virus and prevent[ ] further transmission."  *Id.* at ¶ 26.

The CDC's health guidelines allow for houses of worship to operate safely during the pandemic without requiring set occupancy limits.  The CDC provides "[t]he preeminent and most comprehensive guidelines to protect against the transmission of COVID-19 at houses of worship."  Dr. Flanigan Decl. ¶ 34.  These guidelines set forth several health practices for safeguarding against the transmission of COVID-19 at houses of worship, including "the three most effective behavioral tools in combating COVID-19: social distancing, facial coverings, and hand hygiene."  *Id.* ¶ 1; *see also id.* at ¶¶ 33–43; Pls. Ex. O (the CDC's Communities of Faith guidelines).

## PROCEDURAL HISTORY

A. On October 8, 2020, Plaintiffs filed a complaint in this Court challenging the Order as violating their free-exercise rights.  Dkt. 1.

Plaintiffs filed an Emergency Motion for Order to Show Cause for Temporary Restraining Order and Preliminary Injunction that same day.  Dkt. 2.  Plaintiffs demonstrated that Defendant's Order renders it "impossible" for Plaintiffs' synagogues and their congregants to fulfill their religious obligations because under Defendant's restrictions, it is impossible to conduct services for all of Plaintiffs' congregants.  Dkts. 2-19 ¶ 5; 2-20 ¶ 4; 2-21 ¶ 5.  The main sanctuary of Agudath Israel of Kew Gardens Hills has a capacity of 400.  Dkt. 2-19 ¶ 2.  The main sanctuary of Agudath Israel of Bayswater has a capacity of 250.  Dkt. 2-20 ¶ 2.  The main sanctuary of Agudath Israel of Madison has a capacity of 186.  Dkt. 2-21 ¶ 2.

Plaintiffs showed in their motion that the Order's restrictions on houses of worship violate the Free Exercise Clause because they are not neutral and generally applicable and fail strict scrutiny.  Plaintiffs demonstrated that the restrictions are not neutral for two independent reasons: *first*, that the Order's context showed that Defendant targeted Orthodox Jews for harsh restrictions; and *second*, that the Order imposed disparate treatment on religious activity.  Defendant could not show that the challenged capacity limits survive strict scrutiny because they are not the least restrictive means to curb the transmission of COVID-19 at houses of worship.

On October 9, this Court held a hearing on Plaintiffs' motion and denied it in an oral ruling.  Tr. 41–66.  The court concluded that Plaintiffs did not have a likelihood of success on their claims, determining that the Order's restrictions were neutral and generally applicable and survived

rational basis review.  Tr. 46–65.  On October 19, Plaintiffs filed a notice of appeal to the Second

Circuit from this Court's denial of Plaintiffs' motion for a preliminary injunction.  Dkt. 16.[5]

B. On November 16, Plaintiffs filed an Emergency Application for Writ of Injunction with

the Supreme Court, requesting a writ of injunction pursuant to 28 U.S.C. § 1651(a) barring

Defendant from restricting attendance at houses of worship under the Order.

On November 25, the Supreme Court enjoined Defendant "from enforcing Executive Order

202.68's 10- and 25-person occupancy limits on applicants, including Agudath Israel of America's

current New York-based affiliates," pending appeal.  *Agudath Israel of Am. v. Cuomo*, 592 U.S.

__, 2020 U.S. LEXIS 5707 (Nov. 25, 2020).  The Court addressed Plaintiffs' application in a per

curiam opinion issued in *Diocese*, concluding that Plaintiffs "clearly established their entitlement

to relief pending appellate review" by showing "that their First Amendment claims are likely to

prevail, that denying them relief would lead to irreparable injury, and that granting relief would

not harm the public interest."  2020 U.S. LEXIS 5708, at *2–3.  The Court declared that "by

effectively barring many from attending religious services," the restrictions "strike at the very heart

of the First Amendment's guarantee of religious liberty."  *Id.* at *7.

The Supreme Court held that strict scrutiny applies to the Order's 10- and 25-person

restrictions and that those restrictions likely violate the Free Exercise Clause.  The Court concluded

that Plaintiffs "made a strong showing that these restrictions violate 'the minimum requirement of

neutrality' to religion," *id.* at *3 (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,

508 U.S. 520, 533 (1993)), declaring that "statements made in connection with the challenged rules

can be viewed as targeting the 'ultra-Orthodox [Jewish] community'" and reasoning that "even if

---

[5] On October 21, Plaintiffs filed an Emergency Motion For Injunction Pending Appeal in the
Second Circuit.  A divided panel of the Second Circuit denied Plaintiffs' motion on November 9.
*See Agudath Israel*, 2020 U.S. App. LEXIS 35354.

we put [Defendant's] comments aside, the regulations cannot be viewed as neutral because they single out houses of worship for especially harsh treatment," *id.* (first alteration in original) (quoting *Agudath Israel*, 2020 U.S. App. LEXIS 35354, at *13 (Park, J., dissenting)).

The Supreme Court determined that the individuals limits do not survive strict scrutiny. *Diocese,* 2020 U.S. LEXIS 5708, at *3–6.  Although curbing COVID-19 is a compelling interest, the Court determined that "it is hard to see how the challenged regulations can be regarded as 'narrowly tailored'" because they are "far more severe than has been shown to be required to prevent the spread of the virus at [Plaintiffs'] services."  *Id.* at *5 (quoting *Lukumi*, 508 U.S. at 546).  The Court found that there is "no evidence that [Plaintiffs] have contributed to the spread of COVID-19," recognizing that Defendant "does not dispute" that Plaintiffs have "rigorously implemented and adhered to all health protocols and that there has been no outbreak of COVID-19 in [Plaintiffs'] congregations."  *Id.* at *5–6.

The Supreme Court also rejected Defendant's argument that injunctive relief from the Red and Orange Zone restrictions was unnecessary in light of his November 18 reclassification of the areas in which Plaintiffs' synagogues are located to yellow zones.  The Court recognized that "[i]t is clear that this matter is not moot," and concluded that "injunctive relief is still called for because [Plaintiffs] remain under a constant threat that the area in question will be reclassified as red or orange."  *Id.* at *8.  The Court found that Defendant "regularly changes the classification of particular areas without prior notice" and emphasized that "[i]f that occurs again, the reclassification will almost certainly bar individuals in the affected area from attending services before judicial relief can be obtained."  *Id.*  "[T]here is no reason why [Plaintiffs] should bear the risk of suffering further irreparable harm in the event of another reclassification."  *Id.* at *9.

C. On December 28, the Second Circuit issued an opinion reversing in part and vacating in part this Court's order denying Plaintiffs' motion for a preliminary injunction. Dkt. 26. The Second Circuit reversed this Court's order "to the extent that it denied Agudath Israel's motion for a preliminary injunction as to the Order's fixed capacity limits" and remanded "with directions to grant a preliminary injunction against enforcement of those limits." *Id.* at 35. The Second Circuit also vacated this Court's order "to the extent that it denied a preliminary injunction against enforcement of the Order's 25% and 33% capacity limits on houses of worship" and remanded "for further proceedings consistent with this opinion, including the application of strict scrutiny in the analysis of Agudath Israel's likelihood of success on the merits." *Id.* at 35–36.

The Second Circuit concluded that "both the fixed capacity and percentage capacity limits on houses of worship are subject to strict scrutiny" because they "expressly single[ ] out religion for less favored treatment." *Id.* at 22. The court rejected Defendant's argument that the restrictions are neutral and generally applicable because his favored activities "present lesser risks of COVID-19 transmission than religious worship," reasoning that Defendant "has never claimed that the unrestricted category of 'essential' activities was created based on transmission risk." *Id.* at 22–23. "Instead, '[t]he only explanation for treating religious places differently seems to be a judgment that what happens there just isn't as essential as what happens in secular space,'" which triggers strict scrutiny. *Id.* at 23 (quoting *Diocese*, 2020 U.S. LEXIS 5708, at *12 (Gorsuch, J., concurring)).

The Second Circuit then addressed Defendant's burden to prove that the restrictions are narrowly tailored. The court reasoned that "[n]arrow tailoring requires the government to demonstrate that a policy is the least restrictive means of achieving its objective," cautioning that "[t]he government's justification must be genuine, not hypothesized or invented *post hoc* in

14

response to litigation."  Dkt. 26 at 24 (citations omitted).  The Second Circuit emphasized that "to meet the requirement of narrow tailoring, the government must demonstrate that alternative measures imposing lesser burdens on religious liberty would fail to achieve the government's interests, not simply that the chosen route was easier."  *Id.* at 24–25 (citation omitted).

The Second Circuit held that the Order's fixed capacity limits fail strict scrutiny.  The court concluded that the fixed capacity "limits are 'far more severe than has been shown to be required to prevent the spread of the virus at [Plaintiffs'] services,' particularly because [Defendant] has pointed to no evidence of any outbreaks related to [Plaintiffs'] . . . synagogues."  *Id.* at 25 (quoting *Diocese*, 2020 U.S. LEXIS 5708, at *5).  The Second Circuit emphasized that those restrictions "do not account in any way for the sizes of houses of worship" and "bear little relation to the particular COVID-19 transmission risks [Defendant] identifies," reasoning that Defendant's "identification of those risks relied on broad generalizations made by public-health officials about inherent features of religious worship"[6] and Defendant failed to "explain why the Order's density restrictions targeted at houses of worship are more effective than generally applicable restrictions on the duration of gatherings or requirements regarding masks and distancing."  *Id.* at 25–26.  The court warned that Defendant "may not, of course, presume that religious communities will not comply with such generally applicable regulations."  *Id.* at 26.

The Second Circuit remanded for this Court to analyze whether the percentage capacity limits are narrowly tailored.[7]  The court reasoned that Defendant "appears to assert—for the first

----

[6] The Second Circuit also noted that "[r]ecent public statements from [Defendant] cast some doubt on his experts' claims that religious worship is self-evidently riskier than secular activities," citing "Statewide Contact Tracing Data" revealing that "Religious Activities" were the source for only 0.69% of COVID-19 cases in the State from September through November, similar to or lesser than activities that the Order favors.  Dkt. 26 at 26 n.18; *see also supra* 9.

[7] The Second Circuit rejected Defendant's argument that Plaintiffs never challenged the Orange Zone's 33% capacity limits, finding that Plaintiffs "sought an injunction against enforcement of

time in his opposition brief—that the percentage occupancy limits were in fact a narrowly tailored effort to stem the tide of COVID-19 transmission," citing Defendant's new reference to the New York State Building Code's occupancy calculations.  Dkt. 26 at 27.  In remanding to this Court, the Second Circuit recognized that "the Building Code's occupancy calculations do not refer to 'houses of worship,' but are instead based on neutral conditions like the type of setting used and the 'function of [the] space.'"  *Id.* at 28 (quoting N.Y. State Building Code §§ 1004.5, 1004.6). The Second Circuit emphasized that Defendant's "invocation of the Building Code for the first time on appeal suggest a *post hoc* rationalization," reasoning that "it appears to highlight the absence of contemporaneous evidence about where the specific percentage capacity limits for houses of worship came from."  *Id.* at 28–29.

The Second Circuit concluded that "[a]s the Supreme Court held, 'there can be no question that the [fixed capacity limits], if enforced, will cause irreparable harm,'" reasoning that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'"  *Id.* at 32 (quoting *Diocese*, 2020 U.S. LEXIS 5708, at *6).  The Second Circuit concluded that it was "error" to hold that Plaintiffs had not shown irreparable harm because they could practice their religion with "modifications," reasoning that "[r]eligious adherents are not required to establish irreparable harm independent of showing a Free Exercise Clause violation because a presumption of irreparable injury . . . flows from a violation of constitutional rights." *Id.* at 33 (citation omitted).

The court concluded that if  "plaintiffs are likely to prevail on their Free Exercise claims, it would follow that the Order causes irreparable harm."  *Id.* at 33–34.

---

both the fixed capacity limits and the 25% and 33% capacity limits" and remanding for this Court to consider "whether the percentage capacity limits can survive strict scrutiny."  Dkt. 26 at 14, 28.

The Second Circuit held that the public interest "also favors granting injunctive relief," finding that Defendant did not claim "'attendance at [Plaintiffs'] services has resulted in the spread of the disease' or demonstrate[ ] that 'public health would be imperiled if less restrictive measures were imposed.'" Dkt. 26 at 34 (quoting *Diocese*, 2020 U.S. LEXIS 5708, at *7). Reasoning that "[t]he restrictions challenged here specially and disproportionately burden religious exercise, and thus 'strike at the very heart of the First Amendment's guarantee of religious liberty,'" the Second Circuit held that "[s]uch a direct and severe constitutional violation weighs heavily in favor of granting injunctive relief." *Id.* at 35 (quoting *Diocese*, 2020 U.S. LEXIS 5708, at *7).

D. On January 19, 2021, this Court granted Plaintiffs' motion for a preliminary injunction against the Order's 10- and 25-person occupancy limits on houses of worship for the reasons set forth in the Second Circuit's opinion. The Court held a status conference on January 26, scheduling a hearing for February 8 on Plaintiffs' motion for a preliminary injunction.

On February 2, Defendant submitted a letter requesting that "the Court cancel the preliminary injunction hearing" because Defendant "does not contest the entry of a preliminary injunction against the[ ] percentage capacity limits . . . [i]n light of the decisions made in this case by this Court and the appellate courts that have considered it." Pls. Ex. R at 1. This Court denied the request later that day, finding the terms of Defendant's consented injunction ambiguous.

## ARGUMENT

The only question before this Court on remand from the Second Circuit is whether Defendant can prove that the Order's 25% and 33% capacity limits on houses of worship can survive scrutiny by establishing that those restrictions are narrowly tailored—the "least restrictive means"—of preventing COVID-19 spread at houses of worship. Dkt. 26 at 24 (citation omitted). Defendant must set forth evidence showing that the reason for the disparate treatment of houses of

worship is "genuine, not hypothesized or invented *post hoc* in response to litigation" and "that alternative measures imposing lesser burdens on religious liberty would fail to achieve the government's interests, not simply that the chosen route was easier." *Id.* at 24–25 (citations omitted). Defendant must prove that he "seriously undertook to address the problem with less intrusive tools readily available to it." *Id.* at 24.

Defendant has not satisfied his burden to show that the percentage capacity limits are narrowly tailored because he cannot prove that less restrictive alternative health protocols would fail to reasonably safeguard against the spread of COVID-19 at houses of worship. Public health guidance shows that congregants can protect against COVID-19 spread at houses of worship at 50% maximum occupancy by adhering to other health protocols, such as social distancing, masking, and sanitization. Indeed, by allowing a wide range of businesses and activities to remain open at 50% (or greater) capacity while adhering to these other health protocols, Defendant essentially concedes that such less restrictive means adequately curb COVID-19 spread. And in his February 2, 2021 letter to this Court, Defendant expressly conceded the point.

I.     **The Order's Favorable Capacity Limits On Other Activities Shows That Defendant Believes Less Restrictive Means Are Sufficient To Curb COVID-19 Spread**

Despite imposing 25% and 33% capacity limits on houses of worship in Red and Orange Zones, respectively, the Order concurrently imposes more favorable capacity limits on "essential" and non-essential businesses and activities in those same areas. These more lenient capacity limits on secular conduct demonstrate that even Defendant agrees that less restrictive means than the challenged capacity limits on houses of worship are sufficient to stem the spread of COVID-19.

In Red Zones, the Order imposes 25% capacity limits on houses of worship while it concurrently allows "essential" businesses to open at 50% (or greater) capacity. Entities permitted to operate at such greater capacity include certain retail (including farmer's markets and

convenience stores), certain office-based activities, and manufacturing.  Pls. Exs. I at 3–6; J at 3–6; L at 2–4.  For construction and public transportation, the State imposes no capacity limits whatsoever, requiring only that participants maintain proper social distancing.  Pls. Exs. K at 2–4; M at 3–6.  These guidelines for "essential" businesses also impose protocols designed to safeguard against COVID-19 spread (Pls. Ex. I–M) similar to those the State mandates for houses of worship (Pls. Ex. G; *see also* Pls. Ex. H).

The Order allows even more activities to remain open at 50% capacity in Orange Zones, despite imposing 33% capacity limits on houses of worship.  Secular, commercial conduct that is permitted to operate at 50% (or greater) capacity includes all businesses labeled "essential" and a wide range of businesses labeled non-essential, such as offices, retail, and malls.  *Id.*; *see also* Pls. Ex. I at 3–6; J at 3–6; K at 2–4; L at 2–4; M at 3–6; N at 3–6.  Again, the health and safety protocols imposed are materially identical to those required of houses of worship.  Pls. Ex. G–N.

As Dr. Flanigan describes, "[t]here is no public health rationale for treating houses of worship differently from these favored secular activities, many of which involve gatherings of individuals in enclosed spaces, often for significant periods of time."  Dr. Flanigan Decl. ¶ 51.  "From a public health perspective, there is very little difference, for example, between a group of congregants gathering for religious worship and an hour-long meeting in an office, a construction site involving numerous workers, a retail store with many shoppers, or a subway car full of passengers."  *Id.* at ¶ 52.  Instead, as the CDC guidelines provide, mitigating COVID-19 spread "in *any* group setting" is accomplished primarily through "social distancing, facial coverings, and sanitization."  *Id.*  Transmission of COVID-19 "does not vary based on the reason why individuals are in a given facility."  *Id.* at ¶ 53.

19

## II.    Defendant's Proffered Justifications Fail To Establish That The Order's 25% And 33% Capacity Restrictions On Houses Of Worship Are Narrowly Tailored

Defendant has set forth no evidence showing that the harsh 25% and 33% capacity restrictions are the least restrictive means available to curb COVID-19 spread at houses of worship. Defendant has relied exclusively on generalities relating to gatherings and examples of COVID-19 spread in the earliest days of the pandemic, which does not prove that adhering to less restrictive safety protocols such as social distancing, masking, and sanitization would fail to successfully guard against the transmission of COVID-19 at houses of worship.

To justify his stringent 25% and 33% capacity limits on houses of worship, Defendant has relied entirely upon generalizations regarding gatherings and immaterial examples of COVID-19 spread at gatherings in early-2020.  In his declaration, the New York Health Commissioner states generically that religious services require harsh capacity restrictions because "[g]atherings provide an ideal platform for the efficient transmission of COVID-19 to multiple people at once."  Dkt. 12 ¶ 69.  Dr. Zucker states that "[i]n a religious service or ceremony, the idea is a group of people coming together as a community to interact and pray together" and that congregants "arriv[e] and leav[e] at the same time and are together over an extended period of time," which he reasons "poses a higher risk of transmission of the virus."  *Id.* at ¶ 80.  Yet the only support Dr. Zucker musters in an attempt to defend the stringent capacity restrictions imposed on houses of worship are news sources from the outset of the pandemic, most of which occurred well before Defendant or other public officials declared a state of emergency or imposed health and safety protocols.  *Id.* at ¶¶ 63–66.  None of these articles supports the implementation of set occupancy limits rather than social distancing and other health protocols recommended by the CDC.  And State health officials' recent comments that "the State Health Department was not deeply involved in final decisions that have included allowing public events and mandating business closures based on color-coded

'microclusters,'" and that "they found out about major changes in pandemic policy only after [Defendant] announced them at news conferences – and then asked them to match their health guidance to the announcements," Pls. Ex. Q at 2–3, further demonstrates that these capacity limits cannot possibly be narrowly tailored according to State health guidance.

As the Second Circuit recognized, Defendant's only proffered justification of the houses of worship limits "relie[s] on broad generalizations made by public-health officials about inherent features of religious worship."  Dkt. 26 at 25–26.  Defendant instead must prove why the stringent capacity limits "are more effective than generally applicable restrictions on the duration of gatherings or requirements regarding masks and distancing."  *Id.* at 26.  He has failed to do so.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion for a preliminary injunction barring enforcement of the Order's 25% and 33% capacity restrictions.

This 4th day of February, 2021.

/s/ *Avi Schick*
Avi Schick
avi.schick@troutman.com

TROUTMAN PEPPER HAMILTON SANDERS LLP
875 Third Avenue
New York, NY  10022
(212) 704-6000

Misha Tseytlin (NY Bar No. 4642609)
misha.tseytlin@troutman.com
*Pro Hac Vice Application Forthcoming
W. Alex Smith (Ga. Bar No. 532647)
alex.smith@troutman.com
*Pro Hac Vice Application Pending

***Attorneys for Plaintiffs***